## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

**KARLE ECK**

                        *Plaintiff,*

            v.

**WALMART INC. and WAL-MART ASSOCIATES, INC.**

                        *Defendants.*

CIVIL ACTION NO. 23-cv-02033-JMG

---

### PLAINTIFF KARLE ECK'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

**CONSOLE MATTIACCI LAW, LLC**

*/s/ Rahul Munshi*
Rahul Munshi, Esquire
munshi@consolelaw.com
Holly W. Smith, Esquire
hollysmith@consolelaw.com
1525 Locust St., Ninth Floor
Philadelphia, PA 19102
(215) 545-7676

Counsel for Plaintiff, Karle Eck

Date:   July 1, 2024

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ....................................................................................................1

II.   STATEMENT OF MATERIAL FACTS THAT PRECLUDE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS....................................................3

III.  STANDARD OF REVIEW .....................................................................................3

IV.   LEGAL ARGUMENT ............................................................................................5

    A.  Defendant's Motion for Summary Judgment Should Be Denied On Ms. Eck's Claims of Sex/Pregnancy Discrimination and Retaliation ..........................................5

        1.  Ms. Eck Clears the Low Bar of Establishing a *Prima Facie* Case ...................6

        2.  Ms. Eck Has Set Forth Sufficient Evidence Such That a Reasonable Jury Could Conclude That Defendants' Asserted Reasons for Terminating Her Employment Are Pretextual..........................................................................16

    B.  A Reasonable Jury Could Conclude that Defendants Retaliated Against Plaintiff for Taking a Leave of Absence Pursuant to the FMLA ...................................................22

    C.  Defendant's Motion for Summary Judgment Should Be Denied as There are Material Facts in Dispute, Namely Whether Defendants Discriminated and/or Retaliated Against Plaintiff Because of Her Sex and/or Pregnancy Status ................................................23

V.    CONCLUSION.....................................................................................................25

# **TABLE OF AUTHORITIES**

## **Cases**

Abramson v. William Patterson Coll., 260 F.3d 265 (3d Cir. 2001)...........................................19

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)...........................................................3

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)........................................................3

Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990)................................................19

Barber v. CSX Dist. Servs., 68 F.3d 694 (3d Cir. 1995) ......................................................16

Burlington v. Ellerth, 524 U.S. 742 (1998)................................................................26

Burton v. Teleflex Inc., 707 F.3d 417 (3d Cir. 2013) .....................................................17, 25

Callison v. City of Phila., 430 F.3d 177 (3d Cir. 2006).....................................................22

Celotex Corp v. Catrett, 477 U.S. 317 (1986) ..............................................................4

Chipollini v. Spencer Gifts, 814 F.2d 893 (3d Cir. 1987) ..............................................17, 21

Conoshenti v. Public Service Electric & Gas Company, 364 F.3d 135 (3d Cir. 2004)................................22

Corbetto v. Wyeth Pharma., 619 F.Supp.2d 142 (W.D. Pa. 2007)..................................................6

Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358 (3d Cir. 2008) ........................3, 6, 16, 17, 23

Ezold v. Wolf Block, 983 F.2d 509 (3d Cir. 1993) ..........................................................6

Farrell v. Planters Lifesavers, Co., 206 F.3d 271 (3d Cir. 2001)...........................................17, 22

Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994) ........................................................17, 21, 25

Gerundo v. AT&T Servs., 2016 U.S. Dist. LEXIS 177583 (E.D. Pa. Dec. 20, 2016) .................................24

Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313 (3d Cir. 2000) .......................................16

Graham v. F.B. Leopold Co., Inc., 779 F.2d 170 (3d Cir. 1985)..............................................15

Hunt v. Cromartie, 526 U.S. 541 (1999)....................................................................4

Iadimarco v. Runyon, 190 F.3d 151 (3d Cir. 1999)..........................................................17

Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197 (3d Cir. 1998) ....................................16

Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737 (3d Cir. 1996) .........................................4

In re: Carnegie Ctr. Assocs., 129 F.3d 290 (3d Cir. 1997) ............................................................5

Jackson v. Univ. of Pittsburgh, 826 F.2d 230 (3d Cir. 1987) .........................................................15

Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1988) .................................................................15, 17

Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403 (3d Cir. 1999) ....................................................7

Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173 (3d Cir. 1997) ...............................................22

Leaphart v. Am. Fr. Serv. Comm., 2008 U.S. Dist. LEXIS 85530 (E.D. Pa. Oct. 23, 2008) .........4

Marzano v. Computer Science Corp., 91 F.3d 497 (3d Cir. 1996) ....................................................4

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ......................................3

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) .............................................6, 7, 17, 21

Neiderlander v. Am. Video Glass Co., 80 Fed.Appx. 256 (3d Cir. 2003) .......................................6

Ness v. Marshall, 620 F.2d 517 (3d Cir. 1981) ..............................................................................15

Oakley v. Orthopedic Assocs. of Allentown, Ltd., et al., 742 F.Supp.2d 601 (E.D. Pa. 2010) .....15

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) ...........................................21, 25

Sarullo v. U.S. Postal Serv., 352 F.3d 789 (3d Cir. 2003) ...............................................................6

Scheidemantle v. Slippery Rock Univ., 470 F.3d 535 (3d Cir. 2006) ..............................................6

Seman v. Coplay Cement Co., 26 F.3d 428 (3d Cir. 1994) .............................................................16

Sempier v. Johnson & Higgins, 45 F.2d 727 (3d Cir. 1995) ......................................................6, 21

Sheridan v. E.I. Dupont de Nemours & Co., 100 F.3d 1061 (3d Cir. 1996). .........................17, 19

Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870 (3d Cir. 1972) ............................................3

Sorba v. PA Drilling Co., 821 F.2d 200 (3d Cir. 1987) ..................................................................17

Stewart v. Rutgers Univ., 120 F.3d 426 (3d Cir. 1997) ..................................................................16

St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993)....................................................16, 21, 24

Tomasso v. Boeing Co., 445 F.3d 702 (3d Cir. 2006)......................................................... 18-19, 21

Weldon v. Kraft, Inc., 896 F.2d 793 (3d Cir. 1990) .................................................................7, 15

Williams v. City of Phila., 2020 U.S. Dist. LEXIS 60287 (E.D. Pa. Apr. 6, 2020) ......................17

Wright v. Northampton Cmty. Coll., 2020 U.S. Dist. LEXIS 99726 (E.D. Pa. June 8, 2020)......19

**Statutes**

Family and Medical Leave Act........................................................................................1, 21, 23

Title VII of the Civil Rights Act of 1964.....................................................................1, 5, 16, 23

Pennsylvania Human Relations Act......................................................................................1, 16

**Other Authorities**

Fed.R.Civ.P. 56...........................................................................................................................3

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **KARLE ECK** <br><br> *Plaintiff*, <br><br> v. <br><br> **WALMART INC. and WAL-MART ASSOCIATES, INC.** <br><br> *Defendants*. | CIVIL ACTION NO. 23-cv-02033-JMG |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### I.     INTRODUCTION

Plaintiff, Karle Eck, has brought this employment discrimination and retaliation action against her former employers, Defendants Walmart Inc. and Wal-Mart Associates, Inc., pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), the Pennsylvania Human Relations Act ("PHRA"), and the Family and Medical Leave Act ("FMLA"). The record in this case is riddled with disputed facts that preclude dismissal on summary judgment.  In fact, the foundational issue in this case – why did Defendants single out Ms. Eck for termination of employment – is hotly disputed.  While serving as the Store Manager of Walmart Store 2334 in Lancaster, Ms. Eck reported directly to Market Manager Randall Mummert along with eleven other Store Managers of various stores within Mummert's Market 233.  Ms. Eck was the *only* Store Manager terminated by Mummert in 2021 and was the *only* Store Manager who had recently taken maternity leave. Conspicuously absent from Defendants' Motion for Summary Judgment is *any* undisputed evidence that Ms. Eck was the number one worst-performing Store Manager within Mummert's market at the time of her termination of employment.  Without this **critical** evidence, Defendants' Motion must be denied.

1

Moreover, the circumstances surrounding Defendants' decision to terminate Ms. Eck's employment – and *only* Ms. Eck's employment – as Store Manager in 2021 clearly show that this matter must be decided by a jury.  For example: (1) Ms. Eck earned a meteoric rise at Walmart beginning in 2010 when she started as an hourly part-time associate and culminating in her promotion to Store Manager in 2017; (2) a reasonable jury could conclude that Mummert was surprised by Plaintiff's pregnancy announcement and decided to terminate Plaintiff's employment before she could again cause a disruption to his business by taking another maternity leave; (3) immediately before Ms. Eck commenced her first-ever maternity leave in August 2020, her store's conditions were so immaculate that Mummert's direct supervisor visited the store, lauded its state, and commended Ms. Eck's leadership; (4) Ms. Eck was placed on progressive discipline **for the first time in her career** in early 2021, mere months after she returned from federally-protected maternity leave, and there is **no evidence** that Defendants even considered terminating Ms. Eck's employment prior to her taking maternity leave in late 2020; and (5) Defendants' own objective metrics show that Ms. Eck's Walmart store in Lancaster was *not* the worst-performing store within the market at the time of her termination or at **any** time. Under these circumstances and the undisputed chronology of events, summary judgment must be denied.

For the purposes of this motion, the Court must accept as true Ms. Eck's version of the events and any inferences arising therefrom. Consequently, summary judgment must be denied because only a jury can determine if Ms. Eck's sex, maternity status, and/or her FMLA leave played a factor in Defendants' decision to terminate her employment.  As set forth in detail herein, Ms. Eck has met her burden at this stage to present sufficient evidence from which a reasonable jury could conclude that Defendants discriminated and retaliated against her.  As such, Defendants' Motion should be denied, and Ms. Eck should be permitted to present her case to a jury.

## II.    STATEMENT OF MATERIAL FACTS THAT PRECLUDE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS.

Plaintiff has filed, contemporaneous with this Memorandum of Law, a separate Statement of Disputed Facts and Statement of Additional Facts Precluding Summary Judgment (collectively, "PSF"). The PSF contains citations to the record, which are attached as Exhibits. Plaintiff incorporates the PSF as if set forth fully herein.

## III.    STANDARD OF REVIEW

Summary judgment under Fed.R.Civ.P. 56 may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). If there are any genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiff, summary judgment should be denied. Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 362 (3d Cir. 2008).

At the summary judgment stage, the role of the trial judge is to determine whether or not there is a genuine dispute of material fact, as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The Court must view the facts in the **light most favorable** to the non-moving party – here Plaintiff – and must draw **all inferences** in favor of the Plaintiff. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). On a motion for summary judgment, a "district court must resolve all inferences, doubts, and issues of credibility against the moving party." Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 874 (3d Cir. 1972) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)).

The Third Circuit has made clear: "The burden of persuasion on summary judgment remains unalterably with the employer as movant." C.A.R.S., 527 F.3d at 362. The employer

retains the burden of persuading the Court that, "even if all the inferences which would reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, **no reasonable jury** could find in the plaintiff's favor." Marzano v. Computer Science Corp., 91 F.3d 497, 502 (3d Cir. 1996) (emphasis added). Thus, if there is any record evidence from which a reasonable inference may be drawn in favor of the non-moving party, then "the moving party simply cannot obtain summary judgment." Celotex Corp v. Catrett, 477 U.S. 317, 330 n.2 (1986).

Even when the facts are not in dispute, summary judgment must be denied if competing inferences can be drawn from the undisputed facts on material issues. Hunt v. Cromartie, 526 U.S. 541, 552-53 (1999) ("Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible to different interpretations or inferences by the trier of fact."). "Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment." Leaphart v. Am. Friends Serv. Committee, No. 07-4919, 2008 U.S. Dist. LEXIS 85530, at *1 (E.D. Pa. Oct. 23, 2008) (citing Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 744 (3d Cir. 1996)).

Defendants cannot prevail on their Motion because Defendants have not demonstrated by admissible evidence that no reasonable jury could find in Plaintiff's favor on her claims of sex and pregnancy discrimination and/or concomitant retaliation. There are genuine issues of material fact in dispute, including as to motivation and credibility, which must be decided by a jury, and from which a jury could infer from the record evidence that Defendants discriminated against Plaintiff because of her sex and retaliated against her for taking federally-protected maternity leave and giving birth to a child.

## IV.    <u>LEGAL ARGUMENT</u>

### A. Defendant's Motion for Summary Judgment Should Be Denied On Ms. Eck's Claims of Sex/Pregnancy Discrimination and Retaliation.

Defendants' Motion for Summary Judgment should be denied outright with regard to Ms. Eck's pregnancy discrimination and retaliation claims.[1] "There is employment discrimination whenever an employee's pregnancy is a motivating factor for the employer's adverse employment decision." <u>In re: Carnegie Ctr. Assocs.</u>, 129 F.3d 290, 294 (3d Cir. 1997) (citing 42 U.S.C. §2000e-2(m)). As set forth below, Ms. Eck meets her low burden in establishing a *prima facie* case of pregnancy discrimination and retaliation. In short, a jury could conclude that the circumstances surrounding Defendants' decision to terminate Ms. Eck's employment when she was the *only* Store Manager who recently took maternity leave and was demonstrably *not* the worst-performing Store Manager in the relevant market reflect persuasive circumstantial evidence suggesting unlawful discrimination and retaliation by Defendants.  Furthermore, a jury could conclude that Defendants' stated reasons for terminating Ms. Eck's employment are pretext.  In addition to the evidence in support of Ms. Eck's satisfaction of the fourth prong of the *prima facie* case, Ms. Eck can point to numerous facts that could lead a reasonable jury to either disbelieve Defendants' asserted reasons for terminating her employment or believe that a discriminatory and/or retaliatory reason more likely than not caused the adverse action.[2]

---

[1] The Pregnancy Discrimination Act amended Title VII to specify that discrimination "because of sex" or "on the basis of sex" includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).

[2] Plaintiff's retaliation claims under Title VII and the PHRA stem from the retaliatory conduct she faced following her pregnancy announcement and concomitant maternity leave.  She is not asserting that she was retaliated against for any protected activity related to complaints of discrimination, as anticipated by Defendants in their Motion for Summary Judgment.

### 1. Ms. Eck Clears the Low Bar of Establishing a *Prima Facie* Case.

Plaintiff's claim of sex and pregnancy discrimination is analyzed pursuant to the burden-shifting test set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Regarding pregnancy discrimination Plaintiff must establish a *prima facie* case by proffering sufficient evidence from which a jury could determine that: (1) she was pregnant and the employer knew she was pregnant; (2) she was qualified for the position; (3) she suffered an adverse employment decision; and (4) "there is some nexus between her pregnancy and her employment termination that would permit a fact-finder to infer unlawful discrimination."[3]  <u>See</u> <u>C.A.R.S.</u>, 527 F.3d at 365. Plaintiff's sex discrimination claim must be analyzed under a slightly different *prima facie* framework: (1) she is a member of the protected class; (2) she was qualified for the position; (3) she suffered an adverse employment decision; and (4) under circumstances raising an inference of discriminatory action.  <u>See</u> <u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003).

Courts routinely find that there is a **low bar** for establishing a *prima facie* case of employment discrimination.  <u>See</u> <u>Scheidemantle v. Slippery Rock Univ.</u>, 470 F.3d 535, 539 (3d Cir. 2006); <u>Ezold v. Wolf Block</u>, 983 F.2d 509, 523 (3d Cir. 1993) ("Because the *prima facie* case is easily made out, it is rarely the focus of the ultimate disagreement.").  Establishing a *prima facie* case is not an onerous burden and is easily met.  <u>See</u> <u>Corbetto v. Wyeth Pharma.</u>, 619 F.Supp.2d 142 (W.D. Pa. 2007) (quoting <u>Sempier v. Johnson & Higgins</u>, 45 F.2d 724, 728 (3d Cir. 1995)). Cases in the Third Circuit hold that strict interpretations of the *prima facie* case should not be used to deny the plaintiff an opportunity to demonstrate that an employer's justifications for its actions are pretextual.  <u>See</u> <u>Sempier</u>, 45 F.3d at 729; <u>see also</u> <u>Neiderlander v. Am. Video Glass Co.</u>, 80 Fed.Appx. 256, 261 (3d Cir. 2003) (the burden of establishing a *prima facie* case is "not onerous"

---

[3] Defendant does not dispute that Plaintiff has met the first three prongs of the *prima facie* case. <u>See</u> Defendant's Brief in Support of Motion for Summary Judgment at p.5.

and is a "low threshold").  The *prima facie* case should be flexible, tailored to fit the specific context in which it is applied and not squeezed into a one-size-fits-all formula.  <u>Jones v. Sch. Dist. of Philadelphia</u>, 198 F.3d 403, 411 (3d Cir. 1999); <u>Weldon v. Kraft, Inc.</u>, 896 F.2d 793, 798 (3d Cir. 1990) ("The framework set forth in <u>McDonnell Douglas</u> . . . was never intended to be rigid, mechanized or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.") (internal citations omitted).

This Section will focus on the plain fact that Defendants' argument that Plaintiff is unable to meet the fourth prong of the *prima facie* analysis is unpersuasive. A review of the chronology of events during Plaintiff's tenure with Defendants is critical. Through this review it is evident that Defendants considered Plaintiff a solid performer up until her announcement of maternity leave in 2020, and only upon her return from maternity leave did Defendants place Plaintiff on a path to termination notwithstanding her job performance to date and as compared to the other Store Managers in her market.  Taking the evidence on the record in the light most favorable to Plaintiff, she has set forth ample evidence demonstrating Defendants' bias in its termination of her employment.  As such, summary judgment on Plaintiff's claims should be denied.

***First,*** it cannot be disputed that Defendants consistently expressed that Ms. Eck performed admirably at Walmart from the outset of her employment in 2010 and until she announced her pregnancy in or around December 2019.  At age 21, Ms. Eck began her career at Walmart as a part-time associate. During the seven (7) years following her initial hire, Plaintiff ascended the ranks at Walmart, serving as a full-time hourly associate in several departments, a market assistant, assistant manager, and ultimately, as a co-manager in multiple Walmart stores. Plaintiff was rated as a "Solid Performer" on every annual performance review she received during her tenure in these

roles, the second-highest possible performance rating.  <u>See</u> PSF ¶¶164-166.  Prior to learning of

Plaintiff's pregnancy and intention to take maternity leave in January 2020, Mummert provided

Plaintiff with overwhelmingly positive performance ratings and feedback in her role as Store

Manager. In 2018, Mummert ranked Plaintiff as a "Solid Performer" on her annual performance

review. In 2019, Mummert again ranked Plaintiff as a "Solid Performer" on her annual

performance review. Prior to learning about Plaintiff's pregnancy, Mummert had never given

Plaintiff a poor performance review, coached her or subjected her to any formal discipline, nor did

he ever contemplate terminating her employment.  <u>Id.</u> at ¶¶171-178.  It was only **after** Ms. Eck

announced her pregnancy to Mummert in or around December 2019 did he issue to her an

"Improvement Needed" performance rating in February 2020.  Prior to receiving the 2020 annual

review, Plaintiff had not been coached, counseled, disciplined, or even made aware of any of the

alleged performance issues identified in the document.  <u>Id.</u> at ¶¶194-196.[4]

**_Second_**, a reasonable jury could conclude that Plaintiff's pregnancy announcement

surprised Mummert and caused him to build a campaign leading to her termination before she

could ever take maternity leave again. Defendants' argument that Mummert is the person who

recruited and promoted Plaintiff, and therefore he could not have had any bias against her, entirely

misses the mark.  When Mummert decided to promote Plaintiff in 2017 to Store Manager, he knew

that Ms. Eck was unmarried and had no children.  <u>Id.</u> at ¶170.  Very shortly _after_ her promotion,

Ms. Eck quickly became engaged and got married.  Plaintiff informed Mummert in October or

---

[4] Walmart's focus on alleged performance deficiencies prior to Ms. Eck's pregnancy announcement is a clear attempt to distract from the fundamental issue – Mummert never even _considered_ terminating Plaintiff's employment until a point in time _after_ she announced her intention to take maternity leave.  Rather, Plaintiff's pre-pregnancy performance evaluations from Mummert consistently praise not only her objective sales numbers but also her subjective leadership skills.  <u>See, e.g.</u>, PSF at ¶174.

November 2019 that she was undergoing fertility treatments, which would impact her work schedule. Mummert responded by stating that it can "take a while" to get pregnant through fertility treatments. Fortunately, Plaintiff's fertility treatments succeeded on her first attempt.

In January 2020, Plaintiff informed Mummert that she would be taking maternity leave for several months starting in August 2020. Mummert knew that his Store Manager's leave would take place over Black Friday (the start of the holiday season) and the store's annual inventory, which are two of the busiest times of year for Walmart and where managers are generally expected to be present. Mummert admitted at his deposition that Plaintiff's maternity leave would result in a disruption to the normal flow of business at the Lancaster store. Moreover, when he learned that Plaintiff was pregnant with her first child – and knowing Plaintiff's age (30) and recent marriage – Mummert considered the possibility that Plaintiff would get pregnant again and take another maternity leave. Prior to Plaintiff, no Store Manager had *ever* taken maternity leave during Mummert's tenure as Market Manager for Market 233. Id. at ¶¶184-192. After learning that Plaintiff was pregnant and intended to take maternity leave, Mummert's demeanor towards Plaintiff changed and his treatment of her became markedly worse. As Plaintiff testified:

> I know Randy – I could feel that he was upset I was going to be out. I don't think he expected my IVF to happen so quickly. I was lucky enough to get pregnant on the first round, and I was going to be out during the busiest holiday season where the store makes the most money along with the inventory.
>
> And then I'm young, I planned on having another kid, and I know that he knew that, so I was going to be out even longer when I have another kid, and I could feel that he was targeting me for that.

Id. at ¶193.

**Third**, Plaintiff successfully navigated the challenges from the Covid-19 global pandemic and left the Lancaster store in excellent condition when she commenced maternity leave in August

2020. On June 26, 2020, shortly before her maternity leave, Plaintiff sent an email to Mummert's supervisor – Ann-Louise Almeida – highlighting the Lancaster store's stellar performance with respect to the Online Grocery and General Merchandise ("OGP") metrics, freight flow and related processes, and employee engagement. Among other highlights, Plaintiff showed Almeida that **within Mummert's Market of twelve stores**, the Lancaster store ranked **number one** in numerous Walmart metrics, and that the backrooms were entirely pallet-free for *months*, exhibiting the store's cleanliness and freight management under Plaintiff's leadership. Plaintiff also attached a power point slide deck to her email which contained photographs memorializing the immaculate physical condition of the Lancaster store. Id. at ¶¶199-200. This email is specific evidence of Plaintiff's high performance in her role and shows how well she performed relative to the other Store Managers in Market 233.

Almeida provided the following response to Plaintiff's June 26th email:

> **Karle,**
> **WOW!!! WOW!!! WOW!!!. So proud of you and the team. The pictures look amazing. I was so impressed that I sent your email to Mr. Redfield [Almeida's supervisor].** 😊
>
> **I am going to make it a point to get in there before your maternity leave. I am so excited for you and all of [the Lancaster store].**

Id. at ¶202.

Following receipt of Plaintiff's June 26th email and prior to Plaintiff's maternity leave, Almeida visited the Lancaster store. During her visit, Almeida marveled at how good the store looked and requested permission from Plaintiff to film a video titled "What Good Looks Like" to distribute to other stores in her region. Prior to Plaintiff's maternity leave, per Almeida's request, a video was filmed in the Lancaster store highlighting the condition of the store which Almeida told Plaintiff that "she was going to show to everybody." Id. at ¶¶203-205.

The bottom line is this: at the time that Plaintiff went out on maternity leave in August 2020, (1) the backrooms of the Lancaster store were pallet-free and had been for more than two months; (2) the backrooms of the Lancaster store were in "excellent" condition; (3) there were no pallets on the sales floor at the Lancaster store; (4) the top stock was filled at the Lancaster store; (5) the Lancaster store was zoned properly; (6) the Lancaster store was clean; (7) there were no trailers on the property of the Lancaster store; (8) the Lancaster store was not struggling with freight; (9) employee engagement was high at the Lancaster store; and (10) the Lancaster store was outperforming the market average on multiple of the OGP metrics that Market 233 store managers' performance was assessed based on. Id. at ¶¶206-216. Any arguments by Defendants to the contrary, as set forth in their Motion for Summary Judgment, merely raise factual disputes that must be resolved by a jury in this matter.

Further, it is undisputed that the myriad challenges the Lancaster store faced with regard to freight buildup, improper zoning, and cleanliness, among others, arose **while Plaintiff was on maternity leave** and therefore they did **not** reflect poor performance on Plaintiff's part. During the maternity leave, freight flow issues arose that led to an accumulation of excess freight. As a result of the freight flow issues, the backroom of the Lancaster store became full of freight. The backlog of freight became so great that it began spilling onto the sales floor. Eventually, while Plaintiff was out on maternity leave, the Lancaster store began utilizing storage trailers which were set up on the parking lot to store the excess freight. When Plaintiff returned from maternity leave on December 7, 2020, the Lancaster store was in shambles. There were 35 to 40 trailers of unprocessed freight in the parking lot; the backroom of the Lancaster store was filled with unscanned bins and pallets of unprocessed freight; and there were pallets of merchandise all over the sales floor. Id. at ¶¶227-235. After she returned from leave, Plaintiff requested that Mummert

send associates from other stores in the Market to assist with processing the excess freight but her requests were denied. While denying Plaintiff's requests for associates to be sent from other stores in Market 233 to help the Lancaster store work through the backlog of freight, Mummert granted similar requests from store managers in the Market who were not recently pregnant and had not recently taken FMLA leave. Id. at ¶¶236-237.[5]

**Fourth**, on March 25, 2021, Mummert administered to Plaintiff a Yellow Coaching, which was Plaintiff's first-ever disciplinary notice in her decade-plus tenure with Defendants, and he started the paperwork trail to termination. The alleged issues raised in the Yellow Coaching all derived from the various challenges that arose at the Lancaster store **while Plaintiff was on maternity leave**. Nevertheless, Plaintiff complied with the Yellow Coaching's demands and thoroughly documented numerous specific action plans to tackle these issues that had been impacting the Lancaster store since Plaintiff's return from maternity leave and which would bring the store's condition back to the level in which she left it, as reflected in her email to Almeida on June 26, 2020. Mummert acknowledged that the action plans Plaintiff prepared and submitted after the Yellow Coaching were adequate.

However, just six (6) weeks after the Yellow Coaching, Mummert proceeded to place Plaintiff on an Orange Coaching, which was the next step of the progressive discipline process. The Orange Coaching falsely stated that Plaintiff "failed to build an effective plan" to deal with the freight issues at the Lancaster store. After receiving the Orange Coaching, Plaintiff continued to formulate action plans for the Lancaster store. Mummert acknowledged that the May 18th Action Plan was a comprehensive plan on how to deal with the issues identified in Plaintiff's Orange

---

[5] The issue is not that Mummert allowed the Lancaster store to be in disarray. It is that he targeted Plaintiff's store and Plaintiff while she was performing adequately as compared to other stores in Market 233, and he singled her out for termination so that she could be replaced with a male individual who potentially would not take maternity leave in the future.

Coaching and that the plan reflected good leadership on Plaintiff's behalf.  Id. at ¶¶ 250-259. But, there was nothing Plaintiff could do at that time to save herself from termination. Mere weeks after the Orange Coaching, on July 24, 2021, Mummert submitted his request to terminate Plaintiff's employment.[6]  Id. at ¶262. **Again, there is no evidence that Walmart even *considered* terminating Plaintiff's employment prior to her taking maternity leave.** Id. at ¶178.

*Fifth*, and critically important for the purposes of this motion, Defendants **have not and cannot** show that Plaintiff was the worst-performing Store Manager in Market 233 at the time of her termination or at any time.  If a jury concludes that Plaintiff was *not* the worst-performing Store Manager, i.e., ranked number 12 of 12, the jury certainly could conclude that the circumstances surrounding the termination may have been related to Plaintiff's protected status and maternity. For example, according to Defendants' own objective metrics, when Mummert placed Plaintiff on a Yellow Coaching in March 2021, the Lancaster store was ranked: (1) 10 of 12 on First-time pick rate; (2) 9 of 12 on On-time pick rate; (3) 10 of 12 on pre-sub; (4) 10 of 12 on post-sub; and (5) 8 of 12 on customer satisfaction. Id. at ¶248.  When Mummert placed Plaintiff on the Orange Coaching in May 2021, the Lancaster store was identified as one *of six* stores in Market 233 that were struggling with certain OGP metrics, but **none** of these other Store Managers were fired by Mummert in 2021. Id. at ¶255.  When Mummert made the decision to terminate Plaintiff's employment in July 2021, the Lancaster store was ranked: (1) 8 of 12 on First-time pick rate; (2) 7 of 12 on On-time pick rate; (3) 9 of 12 on pre-sub; (4) 10 of 12 on post-sub; and (5) 100% on customer satisfaction, better than five other stores in Market 233. Id. at ¶268.

---

[6] Plaintiff went out on medical leave from June 2 to June 28, 2021, as a result of the stress and anxiety caused by the discriminatory and retaliatory treatment she was experiencing at Walmart. See PSF at ¶¶ 260-261.

Walmart is suggesting that various performance issues were unique to Plaintiff and Plaintiff's store, but that is not true. In 2020 and 2021 multiple stores within Market 233 were experiencing freight flow issues which resulted in excess freight, unscanned bins, and pallets in their backrooms and sales floors, but the *only* Store Manager terminated in 2021 was Plaintiff. Id. at ¶234; 246; 254; 267. It is for the **jury** determine *why* Plaintiff was singled out among these Stores Managers, and whether Plaintiff (who was the *only* Store Manager to have recently taken maternity leave) was treated differently and singled out for unlawful reasons.

Specifically, in 2020 and 2021, Steve Myers, another Store Manager in Market 233, was experiencing identical freight and staffing issues as those Plaintiff was dealing with in the Lancaster store.[7] The freight issues at Myers' store were so significant that excess freight and pallets were being stored on the second floor of his store which is where the Market 233's offices are located, including Mummert's office. Throughout 2021, Myers' store was performing worse than Plaintiff on OGP metrics, but Mummert sent assistance to Myers' store to help with processing of the excess freight, sometimes for several weeks at a time. Myers received a documented verbal discussion regarding store standards prior to being given a Yellow Coaching and was given 30 days to improve upon the issues raised during the documented verbal discussion prior to receiving a Yellow Coaching. Mummert put Myers on a Yellow Coaching in January 2021 for identical issues as those addressed in Plaintiff's Yellow, Orange, and Red Coachings. However, Myers was given more than ten (10) months to improve upon the issues covered by his

---

[7] Walmart argues that Myers is not an appropriate comparator due to his store serving as an Academy House. This is a distinction without a difference. Their core responsibilities – running the store – remained the same. And the issues regarding freight, modulars, zoning, etc. were identical in both stores. The question for the jury is why was Plaintiff terminated and Myers retained if both stores suffered from these same infirmities? Why was Myers given a year to improve off the Yellow Coaching but Plaintiff's progressive discipline was expedited?

Yellow Coaching before being placed on an Orange Coaching. Myers was placed on an Orange Coaching for store standards in September 2021, but he was never given a Red Coaching or terminated. Given the fact that his store was experiencing identical issues with freight, bin scanning, and zoning in 2021, Myers testified that it was surprising that Plaintiff received Yellow, Orange, and Red Coachings within a span of less than four (4) months. Id. at ¶¶276-286.

A reasonable jury could conclude that Randall Mummert, the Market Manager, Plaintiff's direct supervisor, and the sole decisionmaker in this action, acted based on a discriminatory and/or retaliatory bias in terminating Plaintiff's employment. Based on the record evidence, it is for the **jury** to reach this decision, not the Court on a Motion for Summary Judgment. **"When the defendant's intent has been called into question, the matter is within the sole province of the factfinder."** Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1988). As the Third Circuit has noted, "because intent is a substantive element of the cause of action – generally to be inferred from the facts and conduct of the parties – the principle is particularly apt that courts should not draw factual inferences in favor of the moving party and should not resolve any genuine issues of credibility." Ness v. Marshall, 620 F.2d 517, 519 (3d Cir. 1981). At the summary judgment stage, "all that is required [for the non-moving party to survive the motion] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve [at trial] the parties' differing versions of the truth." Oakley v. Orthopedic Assocs. of Allentown, Ltd., et al., 742 F.Supp.2d 601, 604 (E.D. Pa. 2010) (quoting Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 233 (3d Cir. 1987)).[8]

---

[8] Of course, Mummert denies treating Plaintiff in a sex-discriminatory manner. Importantly, however, a plaintiff's testimony **alone** is sufficient to create a genuine issue of fact about this issue. See Weldon, 896 F.2d at 800 (noting that "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion"); Graham v. F.B. Leopold Co., Inc., 779 F.2d 170, 173 (3d Cir. 1985) (observing that plaintiff's deposition testimony could suffice to create a genuine

Importantly, as the Third Circuit has held, summary judgment is to be used **<u>sparingly</u>** in employment discrimination cases.  <u>C.A.R.S.</u>, 527 F.3d at 369.  The Third Circuit urges particular caution about granting summary judgment to an employer when intent is at issue, particularly in discrimination cases.  <u>Goosby v. Johnson & Johnson Med., Inc.</u>, 228 F.3d 313, 321 (3d Cir. 2000); <u>see also</u> <u>Stewart v. Rutgers Univ.</u>, 120 F.3d 426, 431 (3d Cir. 1997) (explaining that the summary judgment standard is to be "**applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues**.")   Additionally, the relevant laws in this matter (Title VII and PHRA) are remedial statutes, and therefore must be interpreted broadly to protect the rights of individuals.  <u>Idahoan Fresh v. Advantage Produce, Inc.</u>, 157 F.3d 197, 202 (3d Cir. 1998) (noting that the court must construe remedial statutes broadly).  In light of the foregoing, summary judgment on Plaintiff's discrimination and retaliation claims must be denied.

> **2.  Plaintiff Has Set Forth Sufficient Evidence Such That a Reasonable Jury Could Conclude That Defendants' Asserted Reasons for Terminating Her Employment are Pretextual.**

"Once a plaintiff establishes a *prima facie* case the law creates a presumption of unlawful discrimination, and the defendant employer must articulate a legitimate nondiscriminatory explanation for the employer's adverse employment action."  <u>Barber v CSX Dist. Servs.</u>, 68 F.3d 694, 698 (3d Cir. 1995) (quoting <u>Seman v. Coplay Cement Co.</u>, 26 F.3d 428, 432 (3d Cir. 1994)).  If the employer is able to meet its burden, then the plaintiff will be able to defeat summary judgment by demonstrating evidence from which a jury could conclude that the employer's stated reason is a pretext for discrimination.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 507 (1993).  At summary judgment, the issue "is whether [the plaintiff] has pointed to evidence of inconsistencies and implausibilities in the employer's proffered reasons for [the employment

---

dispute about a material issue).  It is for the jury to decide who to believe – Plaintiff or Defendants.

actions] that *could* support an inference that the employer did not act for nondiscriminatory reasons." Sorba v. PA Drilling Co., 821 F.2d 200, 205 (3d Cir. 1987) (citing Chipollini v. Spencer Gifts, 814 F.2d 893, 900 (3d Cir. 1987)).

In other words, Plaintiff can defeat summary judgment by pointing to some evidence from which a rational factfinder could reasonably either disbelieve the employer's articulated explanation or "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Thus, "rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." Sheridan v. E.I. Dupont de Nemours & Co., 100 F.3d 1061, 1071 (3d Cir. 1996). The plaintiff is not required to produce direct evidence of discriminatory intent to demonstrate pretext and survive a motion for summary judgment. Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013). Moreover, Plaintiff's "evidence of pretext need not be overwhelming." Williams v. City of Phila., No. 18-3875, 2020 U.S. Dist. LEXIS 60287, at *21 (E.D. Pa. Apr. 6, 2020).

"The *prima facie* case and pretext inquiries often overlap." C.A.R.S., 527 F.3d at 370. Therefore, "evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the McDonnell Douglas formula requires [the Court] to ration the evidence between one stage or the other." Id. (citing Farrell v. Planters Lifesavers, Co., 206 F.3d 271, 286 (3d Cir. 2001)); Iadimarco v. Runyon, 190 F.3d 151, 166 (3d Cir. 1999) (explicitly referring to the evidence of the *prima facie* case in finding evidence supporting pretext); Jalil, 873 F.2d at 709 n.6 ("Although this fact is important in establishing plaintiff's *prima facie* case, there is nothing preventing it from also being used to rebut the defendant's proffered explanation.").

Here, in addition to the evidence set forth above in support of Plaintiff's satisfaction of the fourth prong of the *prima facie* case, Plaintiff can point to facts that could lead a reasonable jury to either disbelieve Defendants' asserted reasons for terminating Plaintiff's employment or believe that a discriminatory or retaliatory reason more likely than not caused the action. Defendants' stated reason for terminating Ms. Eck's employment (performance) is suspect for several reasons.

Most importantly, as described above, Plaintiff was **not** the least successful Store Manager in Market 233 at the time of her termination. Defendants have not even argued otherwise. Rather, Defendants spend much time outlining various deficiencies in the Lancaster store and/or Plaintiff's leadership. But Defendants have **not** described what, if any, metrics they relied upon to determine that in 2021, at the time of Plaintiff's termination, Plaintiff was ranked number 12 of 12 in Market 233. Defendants' own metrics tell a different story – Plaintiff was typically "middle of the pack" on nearly every store metric calculated and distributed by Walmart. Consequently, the jury will be tasked with answering the question of *why* Ms. Eck was singled out for termination by Mummert. And if the jury does not believe that Mummert terminated Plaintiff's employment because of her performance, a reasonable jury could find in Plaintiff's favor. These are all **jury questions** that are not appropriate for resolution on summary judgment.

Moreover, Ms. Eck undisputedly was successful in her role as Store Manager of Store 2334 under Mummert for a significant period of time before she announced her pregnancy in or around December 2019. What directly followed her pregnancy announcement – in short order – was a negative performance review, accountability for store conditions that deteriorated while she was on leave, progressive discipline, and termination. Plaintiff may point to her **own** past performance history to sow doubt in Defendants' stated reason for termination when Defendants rely on a performance defense. See Tomasso v. Boeing Co., 445 F.3d 702, 708 (3d Cir. 2006) (holding that

employee can show pretext by affirmative external evidence of good performance); Sheridan, 100 F.3d at 1073 (stating that an employee could show pretext in part by adducing "affirmative evidence of her own accomplishments," including awards, a performance, and "more than a decade of satisfactory performance").[9]

For these very reasons, Third Circuit consistently holds that, when a court is analyzing an employment discrimination claim, the **full picture** must be assessed.  See Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."); Abramson v. William Patterson Coll., 260 F.3d 265, 285 (3d Cir. 2001) ("In determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury . . . would be entitled to view the evidence as a whole.").

Next, a reasonable jury could conclude that Defendants' progressive discipline of Plaintiff in 2021 following her return from maternity leave was merely a pretextual means to an end, i.e., termination.  For example, undisputedly Plaintiff drafted and circulated numerous action plans to

---

[9] See also Wright v. Northampton Cmty. Coll., No. 18-2976, 2020 U.S. Dist. LEXIS 99726, at *34 (E.D. Pa. June 8, 2020) ("Wright can also rely on this evidence of good performance, in conjunction with the other evidence of record, to show pretext because the defendants are relying on poor performance as the reason for termination."); Power v. Lockheed Martin Corp., 419 F.Supp.3d 878, 895 (E.D. Pa. 2020) (in rejecting the argument that past performance cannot establish pretext, "However, Mr. Power cites his past performance as only one of a number of facts that support his claim of discrimination.  Because Mr. Power does not rely on past performance alone, the Court cannot find he has failed to establish pretext on this ground."); Alred v. Eli Lilly & Co., 771 F.Supp.2d 356, 364 (D. Del. 2011) ("In the Court's view, however, the Third Circuit has held that an employee's prior past performance reviews may give rise to an inference of discrimination, if there are factors indicating that the shift from positive evaluations to termination was based on discriminatory motives.") (citing Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1422 (3d Cir. 1991)).

tackle the freight and other issues plaguing the Lancaster store from the maternity time period, and those action plans reflected ample leadership by Plaintiff.  A reasonable jury could conclude, nevertheless, that Mummert continued to move the goalposts on Plaintiff, stymying her ability to succeed while on discipline, by resisting her calls for additional assistance.  See Ciecka v. Cooper Hosp. Sys., No. 15-4075, 2017 U.S. Dist. LEXIS 20539, at *30 (D.N.J. Feb. 14, 2017) (citing "unrealistic goals" on PIP as a form of circumstantial evidence to establish pretext); Beeler v. Norton Healthcare, No. 17-573, 2020 U.S. Dist. LEXIS 45074, at **43-44 (W.D. Ky. Mar. 16, 2020) ("When an employer imposes unreasonable expectations on an employee, the employer may be setting up a situation where the employee cannot help but fail. . . . The employer may be trying to create a seemingly legitimate reason for firing the employee. . . . In this context, when the employer terminates the employee for the reason that the employee's performance is unsatisfactory, the employer's justification may be unworthy of belief. . . . Thus when a question of fact exists as to whether an employer has imposed unreasonable expectations on an employee, **a question of fact exists as to whether the employer's justification, the employee's unsatisfactory performance, is a mere pretext**.") (internal citations omitted).

Mummert quickly escalated Plaintiff's progressive discipline to an Orange Coaching within six weeks, while the evidence shows that other managers were given far more time before being elevated to second-level discipline.  Moreover, it is clear that the third-level Red Coaching was a pure sham, as Mummert even admitted that he had already made the decision to terminate Plaintiff's employment even before issuing the Red Coaching.  The additional two weeks given to Plaintiff served no purpose other than to button-up Defendants' paperwork trail in anticipation of the inevitable termination date.  See PSF at ¶¶266-267.[10]

---

[10] To the extent that Defendants argue that Mummert's decision was informed by feedback received from other members on the market team, the record is clear that Mummert sought this

The Third Circuit is crystal clear that a plaintiff may meet her burden on pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer *or indirectly by showing that the employer's proffered explanation is unworthy of credence*." Chipollini, 814 F.2d at 898 (emphasis in original).  A jury could reasonably infer from the falsity and implausibilities of the Defendants' explanations that Defendants are "dissembling to cover up a discriminatory purpose."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000); see also Tomasso, 445 F.3d at 710 (reversing a grant of summary judgment because even though certain reasons given by the employer for the challenged action may be true, "a rational factfinder could conclude that [they] do not adequately explain the decision to terminate him."); Sempier, 45 F.3d at 724 (cases where the plaintiff credibly attacks the employer's stated reasons for termination "must be resolved by a jury and cannot be resolved on summary judgment").  If the jury thinks a decisionmaker is lying when he or she says that the decision was not motivated by a protected trait, the jury may on that basis conclude that there was a civil rights violation.  See Hicks, 509 U.S. at 510-11 ("[T]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

Based on the foregoing, a reasonable jury could conclude that an invidious discriminatory reason was more likely than not the reason for Defendants' action, and therefore summary judgment should be denied.  See Fuentes, 32 F.3d at 764.

---

feedback only *after* having already deciding to terminate Plaintiff's employment.  See PSF at ¶263.

**B. A Reasonable Jury Could Conclude that Defendants Retaliated Against Plaintiff for Taking a Leave of Absence Pursuant to the FMLA.[11]**

Plaintiff's FMLA claims are analyzed pursuant to the McDonnell Douglas burden-shifting framework, set forth and discussed *supra*. An employer may violate the FMLA by interfering with or denying an employee her rights under the FMLA **or** by discriminating or retaliating against an employee who invokes her statutory rights. 29 U.S.C. §2615(a)(1); 29 U.S.C. §2615(a)(2); Callison v. City of Phila., 430 F.3d 117, 119-120 (3d Cir. 2006). "Employers may not 'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'" Callison, 430 F.3d at 119 (quoting 29 C.F.R. §825.220(c)). To assert an FMLA retaliation claim, a plaintiff must demonstrate that (1) she engaged in protected activity under the FMLA; (2) she suffered an adverse employment action; and, (3) the adverse action was causally related to the exercise of her rights under the FMLA. Id. at 119; Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004).

Plaintiff can demonstrate a causal connection between the exercise of her rights pursuant to the FMLA and Defendants' termination of her employment by relying on a "broad array of evidence, including, but not limited to, temporal proximity and evidence of ongoing antagonism." Tamayo v. Deloitte & Touche, LLP, No. 05-3364, 2007 U.S. Dist. LEXIS 2878 (D.N.J. Jan. 16, 2007) (citing Farrell, 206 F.3d at 283-284). The Third Circuit has said that, "[a]lthough timing and ongoing antagonism have often been the basis of a causal link, our case law has allowed a plaintiff to substantiate a causal connection for the purposes of the *prima facie* case through other types of circumstantial evidence to support that inference." Farrell, 206 F.3d at 280-281. "Temporal proximity and evidence of antagonism 'are not the exclusive ways to show causation,

---

[11] Plaintiff is proceeding only on an FMLA retaliation claim, not an FMLA interference claim.

as the proffered evidence, looked at as a whole, may suffice to raise the inference.'" <u>Kachmar v. SunGard Data Sys., Inc.</u>, 109 F.3d 173, 178 (3d Cir. 1997).

Here, Defendants contests only the last element of Plaintiff's *prima facie case*. Plaintiff's FMLA retaliation claim is closely aligned with her Title VII pregnancy retaliation claim, as both causes of action stem from Defendants' concerted effort to terminate Plaintiff's employment following her protected maternity leave. Under both the FMLA and Title VII, Plaintiff's retaliation claims should survive based on Mummert's swift efforts to discipline and ultimately terminate Plaintiff's employment following her pregnancy announcement. A reasonable jury could conclude that Plaintiff's maternity leave – which took place over the busiest period at Walmart and caused disruption to the business – motivated Mummert to eliminate Plaintiff so that he could replace her with a Store Manager who would not be as likely to take an FMLA maternity leave in the future. Based on the above record, a jury certainly could conclude that Defendants retaliated against Plaintiff for taking FMLA leave, and, as such, Defendants' Motion should be denied.

> **C. Defendant's Motion for Summary Judgment Should Be Denied as There are Material Facts in Dispute, Namely Whether Defendants Discriminated and/or Retaliated Against Plaintiff Because of Her Sex and/or Pregnancy Status.**

The single most important fact in this matter is unquestionably in dispute – whether Plaintiff's maternity leave caused Defendants to take adverse employment actions against Plaintiff. At this stage, the Court is required to draw every inference in Plaintiff's favor. <u>C.A.R.S.</u>, 527 F.3d at 362. As such, the Court must recognize that when Defendants' witnesses testify at trial – presumably – that Plaintiff was not terminated for discriminatory or retaliatory reasons, the jury may not believe their testimony. Defendants' witnesses' actions on the witness stand may reflect doubt or deception in the juror's minds. For example, if Mummert or an HR representative is asked at trial – "did you terminate Ms. Eck because of her pregnancy" or "did you retaliate against

Ms. Eck because she took maternity leave" – to which they respond by pausing, taking a sip of

water, asking counsel to repeat the question, they start sweating, and then, finally, answering "no,"

a reasonable jury could certainly conclude that they are not being truthful in this response. If the

jury thinks that a decision maker is lying when he says the decision was not motivated by a

protected trait or protected activity, the jury may on that basis alone conclude that there was a civil

rights violation. Hicks, 509 U.S. at 510-11. Only the jury should be tasked with weighing factual

disputes and contradicting testimonies, and for deciding whether Defendants' witnesses answered

questions honestly.

Along those lines, in Gerundo v. AT&T Servs., 2016 U.S. Dist. LEXIS 177583 (E.D. Pa.

Dec. 20, 2016), Judge Schmehl denied the defendant's renewed motion for judgment as a matter

of law following a jury verdict in favor of the plaintiff in an age discrimination case, noting the

following in its opinion:

> Indeed, the Court recalls that Roth [the plaintiff's supervisor] was
> an extremely evasive, and, at times, disingenuous witness. Roth was
> impeached several times by plaintiff's counsel [citations omitted],
> including a particularly effective video impeachment concerning the
> reason why Roth would simply not keep plaintiff on the Fiserv
> account since he was doing a good job. On some occasions, the
> Court had to directly question Roth in order to elicit a non-evasive
> response [citations omitted]. Roth rarely answered a question with
> a "yes," "no," "I don't know," or "I don't remember" and then
> providing an explanation. ***Having witnessed Roth's demeanor on
> the stand, the jury apparently did not credit Roth's trial testimony
> that she was not the relevant decision-maker.***
>
> The jury further heard evidence that Roth had met plaintiff in person
> on one occasion in the fall of 2012. The jury heard Roth testify that
> upon meeting plaintiff in person in 2012, she believed him to be in
> his "mid to late 40s." With no offense to plaintiff, it would be
> obvious to any reasonable individual that met plaintiff, that he
> appears to be substantially older than in his "mid to late 40s." Even
> Roth herself testified that at some point during their meeting, she
> said to plaintiff, "You're not planning on retiring anytime soon, are
> you?" Why would she ask that to someone she thought was in his

mid to late forties?  Her statement borders on ridiculous.  ***Obviously, the jury did not find Roth's belief as to plaintiff's age to be credible.***

2016 U.S. Dist. LEXIS 177583, at **11-13 (emphasis added).

Therefore, since Plaintiff can establish a *prima facie* case, Defendants' Motion for Summary Judgment should be denied because, given that Defendants' witnesses' credibility are squarely at issue, a jury could certainly disbelieve them when they articulate reasons for Plaintiff's termination.  Once Plaintiff has pointed to evidence sufficient to discredit Defendants' proffered reasons, "the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case" to survive summary judgment.  Fuentes, 32 F.3d at 764; Burton, 707 F.3d at 427 ("This is because the factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason.").  As the Supreme Court has stated, grounds for disbelieving the proffered reasons for a challenged action, together with Plaintiff's *prima facie* case, can by themselves support a finding of discrimination.  Reeves, 530 U.S. at 146-148 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it might be quite persuasive."). For the reasons set forth above, a reasonable jury could easily conclude that Defendants' proffered reasons are simply false, and that it is more likely than not that discrimination and retaliation caused the adverse actions taken against Plaintiff.

V.    <u>**CONCLUSION**</u>

It is anticipated that Defendants will respond to Plaintiff's arguments by stating that Defendants merely exercised their discretion and made business judgments that cannot be challenged.  Of course, this is not the law.  Courts routinely find that when a defendant employer's

motivation and credibility are at issue, the case should go before for the jury.  When a plaintiff has set forth sufficient evidence of pretext, the case should go before the jury.  When inferences can be drawn in favor of discrimination and retaliation, the case should go before the jury.  Employers are not given carte blanche to take adverse actions against employees under the guise of "business judgment."  To allow a defendant employer unfettered discretion would undercut the fundamental premise of anti-discrimination laws, which are remedial in nature and must be viewed broadly.  In its Motion, Defendant is employing a common tactic of viewing each piece of evidence in a vacuum, arguing that each separate piece of evidence standing alone cannot support a claim of discrimination.  However, the Third Circuit has often ruled that the Court must view the record as a whole picture, **especially** in employment discrimination cases where direct evidence is rare and plaintiffs must rely on circumstantial evidence to make their case.  As the Supreme Court has found, whether the discriminatory action was made for a legitimate business reason or was a mere pretext is a question of fact that could only be resolved by the jury.  Burlington v. Ellerth, 524 U.S. 742 (1998).  Accordingly, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment and permit this action to go before a jury.

Respectfully submitted,

**CONSOLE MATTIACCI LAW, LLC**

*/s/ Rahul Munshi*
Rahul Munshi, Esquire
munshi@consolelaw.com
Holly W. Smith, Esquire
hollysmith@consolelaw.com
1525 Locust St., Ninth Floor
Philadelphia, PA 19102
(215) 545-7676

Counsel for Plaintiff, Karle Eck

Date:   July 1, 2024

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| KARLE ECK<br><br>                               *Plaintiff*,<br><br>                    v.<br><br>WALMART INC. and WAL-MART<br>ASSOCIATES, INC.<br><br>                               *Defendants*. | CIVIL ACTION NO. 23-cv-02033-JMG |

## PLAINTIFF'S STATEMENT OF DISPUTED FACTS AND STATEMENT
## OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT

Plaintiff, Karle Eck, through her undersigned counsel, submits this Statement of Disputed Facts responding to the numbered paragraphs set forth in Defendants' Statement of Undisputed Material Facts In Support of Defendants' Motion for Summary Judgment ("DSF") and Statement of Additional Facts Precluding Summary Judgment (collectively, "PSF").

In its DSF, Defendants set forth **one hundred and sixty-three (163)** allegedly undisputed material facts. As set forth below, the vast majority of those facts are squarely in dispute. The volume of material facts at issue in this case alone precludes summary judgment in Defendants' favor.

## PLAINTIFF'S STATEMENT OF DISPUTED FACTS

### I.    WALMART MAINTAINS AND IMPLEMENTS NONDISCRIMINATORY AND NONRETALIATORY POLICIES AND PROCEDURES[1]

---

[1] The headings contained in DSF contain factual assertions which are not supported by citations to the record. Accordingly, all factual assertions contained in Defendants' headings are disputed. Plaintiff repeats them in her PSF for the Court's convenience only.

1.     Walmart Inc. and Wal-Mart Associates, Inc. ("Walmart" or "Defendants") are equal opportunity employers and prohibit discrimination and harassment based upon, *inter alia*, sex, pregnancy, and disability via the Discrimination & Harassment Prevention Policy.  (*See* Appx.000152-155, Walmart's Discrimination and Harassment Prevention Policy attached as WM-ECK0000350-353).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that Walmart purports to maintain a Discrimination & Harassment Prevention Policy prohibiting discrimination and harassment. The record citation does not support the remainder of the allegation, including, without limitation, that Walmart is an "equal opportunity employer". Any implication that Walmart acted consistent with the Discrimination & Harassment Prevention Policy in connection with Ms. Eck's termination is specifically disputed. PSF ¶¶ 193, 249, 257, 271.

2.     Likewise, Walmart prohibits "taking negative action against any individual for reporting conduct that violates [the Discrimination & Harassment Prevention] policy, cooperating in an investigation, opposing discrimination or harassment, or filing or assisting another individual in filing a complaint of discrimination or harassment with a government agency or court." (Appx.000152, WM-ECK0000351).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that Walmart purports to maintain a Discrimination & Harassment Prevention Policy prohibiting discrimination and harassment. Any implication that Walmart acted consistent with the Discrimination & Harassment Prevention Policy in connection with Ms. Eck's termination is specifically disputed. PSF ¶¶ 193, 249, 257, 271.

3.    Walmart also maintains a Parental Pay policy that provides up to six weeks of pay in a rolling 52-week period while its employees are away from work on parental leave. (Appx.000155-156 Walmart's Parental Pay Policy - WM-ECK0000443-444).

**RESPONSE:** Undisputed.

4.    Walmart maintains a policy titled "Accommodation in Employment (Medical-Related)" (Appx.000157-161, Walmart's Accommodation in Employment (Medical-Related) Policy - WM-ECK0000354-358).

**RESPONSE:** Undisputed.

## II.    PLAINTIFF'S EMPLOYMENT WITH WALMART

### a.    Plaintiff's Job History with Walmart

5.    Between September 2010 and October 2017, Plaintiff held a variety of roles at Walmart, beginning as an hourly associate and subsequently working as an asset protection associate, a market assistant, a store assistant manager, and finally a co-manager before receiving her promotion to Store Manager. (Appx.000003-22, Transcript of Plaintiff's March 18, 2024, Deposition (hereinafter "Pl. Dep."), at 27:20 – 46:9).

**RESPONSE:** Undisputed.

6.    On October 14, 2017, Plaintiff commenced working as a Store Manager at Store 2334 in Lancaster, Pennsylvania. (*Id*. at 46:12).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that she began working as a Store Manager at the Lancaster store in October 2017. The record citation does not support the remainder of the allegation, including that her exact start date was October 14, 2017.

3

7.      Market 233 Manager Randall Mummert (hereinafter "Mr. Mummert") personally recruited and hired Plaintiff for the Store 2334 Store Manager position. (Appx.000022, Pl. Dep., at 46:13 – 46: 15).

**RESPONSE:** Disputed. The record citation does not support the allegation. At the cited testimony, Plaintiff testified only that Mummert hired her for the Store Manager position.

  **b.**  **Walmart's Market 233**

8.      Randall Mummert supervises and monitors the conditions at the twelve stores that comprise Market 233. (Appx.000100, Mummert Dep. 7: 10-15).

**RESPONSE:** Undisputed.

9.      Only one store (Store No. 1529) of the twelve stores in Market 233 is an Academy Store.  (Appx.000115, Mummert Dep: 240: 11-14).

**RESPONSE:** Undisputed.

10.      The Academy Store provides training and teaching content for coaches and managers and is subject to quarterly audits comprised of 1500 questions and surprise visits to ensure the Academy Store was meeting Company Standards.  (Appx.000112-113, Mummert Dep. 237:24 – 238:24).

**RESPONSE:** Undisputed.

11.      Store 1529 is a 250,000 square foot store that does $130 million in sales. (Appx.000112, Mummert Dep. 237:18-21).

**RESPONSE:** Undisputed.

4

### c.    The Store Manager Role in Market 233

12.    Walmart Store Managers are responsible for the operation of their facility. (Appx.000163, Store Manager Job Description, WM-ECK0000439).

**RESPONSE:** Undisputed.

13.    In her role as Store Manager Plaintiff was responsible for, amongst other essential duties:

a.    Providing supervision and developments opportunities for management and hourly associates in the Facility by hiring, training, mentoring, assigning duties, evaluating performance, providing recognition, and ensure diversity awareness;

b.    Ensuring compliance with Walmart policies and procedures by holding Associates and managers accountable, analyzing and interpreting reports, implementing and monitoring asset protection and safety controls, maintaining quality assurance standards, overseeing safety and operational reviews, developing and implementing action plans to correct deficiencies, and providing direction and guidance on executing Company programs and strategic initiatives;

c.    Drive the financial performance of the Facility by ensuring sales and profit goals are achieved, including leading the management team in controlling expenses to ensure they are indexed to sales, developing and implementing plans to correct any deficiencies in financial performance in the Facility, overseeing the creation of budgets, and participating in analyzing economic trends and community needs for budget forecasting;

d.  Direct the management team in facility operations and communicates with both management and hourly associates about facility operations, merchandising, and company direction; and

e.  Drive sales in the Facility by ensuring effective merchandise presentation, including accurate and competitive pricing, proper signing, in-stock and inventory levels, budgeting and forecasting sales, and assessing economic trends and community needs. (*Id.*)

**RESPONSE:** Disputed as stated. The Store Manager Job Description is a document that speaks for itself and Plaintiff is entitled to all inferences arising from the document.

14.    Plaintiff testified that it was also her responsibility as Store Manager to delegate responsibility to make sure that her store's floors were clear. (Appx.000051, Pl. Dep. at 225:4-8).

**RESPONSE:** Undisputed.

15.    Plaintiff testified that it was her responsibility as Store Manager to communicate the safety plans to Associates at her store. (Appx.000050, Pl. Dep. at 225:9-19).

**RESPONSE:** Undisputed.

16.    Plaintiff testified that it was her responsibility to assign an assistant manager and team of associates to work the backroom of the store to handle and unload any new merchandise. (Apppx. 000023, Pl. Dep. at 56:2-18).

**RESPONSE:** Undisputed.

17.    Plaintiff testified that it was important to timely scan merchandise bins because Walmart's system would automatically order more merchandise if the inventory was not accounted

for in the store's system, creating an excessive amount of merchandise in the backroom. (Appx.000061, Pl. Dep. at 251:6 – 251:16).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that if merchandise was not scanned, Walmart's system would automatically order more which could create an excess of merchandise in the backroom. The record citation does not support the remainder of the allegation, including that Plaintiff testified that "it was important to timely scan merchandise bins".

18.    Plaintiff testified that managers were responsible for their store's backroom. (Appx.000023, Pl. Dep. at 56:5).

**RESPONSE:** Undisputed.

19.    Academy Store Managers in Market 233 were responsible for all the duties of a regular Store Manager, like Plaintiff, with the added responsibility of acting as a Walmart "culture champion" in the Market and by leading a training environment that supported all of Market 233 for new hires and managers in training. (Appx.000166, WM-ECK0002963).

**RESPONSE:** Disputed as stated. The Academy Store Job Description is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. Plaintiff disputes any implication that her job was materially different than the Academy Store manager job. The essential functions, competencies, physical activities, and work environment listed on the job description are virtually identical to those included on Plaintiff's job description. *See* Store Manager Job Description (Appendix-000163-165).

20.    To this end, Academy Store Managers are expected to maintain an engaging and inclusive environment that integrates Academy Associates in store meetings and activities and

provides job shadowing opportunities for trainees at the store. (Appx.000166-169, WM-ECK0002963-2966).

**RESPONSE:** Disputed as stated. The Academy Store Job Description is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. Plaintiff disputes any implication that her job was materially different than the Academy Store manager job. The essential functions, competencies, physical activities, and work environment listed on the job description are virtually identical to those included on Plaintiff's job description. *See* Store Manager Job Description (Appendix-000163-165).

21.     Academy Store Managers also managed a larger store with a higher volume of square footage and sales. (Appx.000112, Mummert Dep. 237:12 – 237:21).

**RESPONSE:** Disputed as stated. The cited testimony described Steve Myers' store, not "academy stores" in general.

22.     Unlike regular Store Managers, Academy Store Manager stores were also subject to surprise three-day and 1500 question quarterly assessments which the Academy store must pass with a score of greater than 80 percent. (Appx.000113, Mummert Dep. 238:1 – 238:17).

**RESPONSE:** Undisputed.

23.     If an Academy Store Manager did not pass his or her quarterly assessment or failed a subsequent reassessment, he was subject to disciplinary action, loss of pay, and loss of his "ability for the team to teach the academy content in the areas that they failed in the store." (Appx.000113, Mummert Dep. 238:19 – 238:24).

**RESPONSE:** Undisputed.

8

> **d.      Walmart Supported Plaintiff's Pregnancy and Right to Maternity Leave**

24.      Around late October or early November 2019, Plaintiff informed Mr. Mummert that she was receiving In vitro fertilization ("IVF") treatments. (Appx.000032, Pl. Dep. at 138:7-11).

**RESPONSE:** Undisputed.

25.      Mummert shared with Eck that his family members had experience with IVF treatments and that it could take a long time to become pregnant.  (Appx.000088, Pl. Dep. 321: 4-11).

**RESPONSE:** Undisputed.

26.      Around the end of November or the beginning of December 2019, Plaintiff informed Mummert of her pregnancy. (Appx.000031-32, Pl. Dep. at 137:22 – 138:6).

**RESPONSE:** Disputed. Plaintiff informed Mummert of her pregnancy in January 2020. PSF ¶ 187.

27.      Mummert never made any derogatory or negative comments about Plaintiff's pregnancy.  (Appx. 000086; Appendix-000088, Pl. Dep. at 318: 15-19; 321: 4-7).

**RESPONSE:** Disputed. The record citations do not support the allegation.

28.      On November 20, 2019, Plaintiff texted Mummert that she was "[g]oing back to the doctors[,] having complications."(Appx.000131, ECK-0650).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences

arising from the document. At the record citation, Plaintiff texted Mummert stating: "Randy I need to take a half pto day. Going back to the doctors having complication". Mummert responded: "Ok. Oh".

29.    The next day, on November 21, 2019, Mummert texted Plaintiff to check in on how she was doing and told her to "be careful." (Appx.000131.  ECK-0650).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

30.    On March 18, 2020, Plaintiff texted Mummert that she had a "20 week appointment with [her] regular doctor tomorrow at 7:45 am," and that she "tried to change it to today because [she] scheduled it around inventory and they could not get me in." (Appx.000134, ECK-0671).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

31.    Mummert responded to Plaintiff "[yo]u need to go to your DR appt." (Appx.000134, ECK-671).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

32.    On June 25, 2020, Plaintiff informed Mr. Mummert that she would be "an hour late to work" because she was "[e]xperiencing Braxton Hicks for the first time; and Mummert responded, "Ok. No [p]roblem.  Everything is okay" and "be careful." (Appx.000135, ECK-0692).

10

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

33.     Walmart, through its third-party administrator, Sedgwick, approved Plaintiff's request for short-term disability ("STD") pay and Family Medical Leave of Absence from August 9, 2020, to October 17, 2020, to recover from her pregnancy and to care for her newborn infant, born on or about August 10, 2020. (Appx.000170, Plaintiff's Disability and leave – approval notice - WM-ECK0000224).

**RESPONSE:** Undisputed.

34.     After the birth of Plaintiff's child, Mummert texted Plaintiff to ask, "[h]ow is mom and baby doing?? I hope all is well," and "[t]he baby is beautiful. Congrats." (Appx.000136, ECK-0696).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

35.     Mummert also asked Plaintiff if he could "send a small announcement to the [Store Manager] and regional team about the exciting news." (Appx.000136, ECK-0696).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

36.     On August 16, 2020, Plaintiff emailed Mr. Mummert regarding an issue with her store; and Mummert responded, "I appreciate you keep[ing] me posted. I really need you to enjoy

your LOA and spending time with the baby and Nate. It will go by fast." (Appx.000171, Mummert's August 17, 2020, Email to Plaintiff, Bates-stamped WM-ECK0000474).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Mummert's August 17, 2020 Email. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. The document shows that after receiving an email from a subordinate regarding a refrigeration issue at the Lancaster store, Plaintiff forwarded the email to Mummert, eliciting the response quoted in Defendants' allegation.

37.    Plaintiff routinely engaged in conversations related to work with her peers and co-workers while she was on maternity leave. (Appx.000150, ECK-0760).

**RESPONSE:** Disputed. The record citation does not support the allegation. The document cited by Defendants depicts a text message exchange between Plaintiff and a single co-worker on a single day of her maternity leave. Plaintiff specifically disputes any implication that Plaintiff affirmatively sought to "engag[e] in conversations related to work" while she was on maternity leave.

38.    On August 19, 2020, Market Asset Protection Manager Jennifer O'Brien texted Plaintiff, "You're not attending your inventory miss! Enjoy that little bundle and rest up. Stop checking work email!" (Appx.000127, ECK-0453).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

39.    Plaintiff responded to O'Brien, "It comes up on my phone and I can't stand the notification number next to my icons lol …. I will be disconnected soon." (Appx.127, ECK-0454).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. At the record citation, Plaintiff stated: "It comes up on my phone and I can't stand the notification number next to my icons lol. **My leave went through finally so** I will be disconnected soon." (emphasis added).

40.     O'Brien responded to Plaintiff, "Good! Believe me work isn't going anywhere – what you have at home is far more precious and deserves all your time and attention." (Appx.000128, ECK-0454).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. At the record citation, O'Brien stated: "Good! Believe me work isn't going anywhere – what you have at home is far more precious and deserves all your time and attention **(as exhausting as that may be)**" (emphasis added).

41.     On September 14, 2020, Plaintiff texted her store's people lead "Awesome job on the video!!!" and that "I would reply back in email but I am not suppose to be looking at work emails." (Appx.000129-130, ECK-0519-20).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

42.     On October 16, 2020, Plaintiff texted a screenshot of a work email related to scanning merchandise to one of her assistant store managers. (Appx.000124, ECK-0009).

13

**RESPONSE:** Disputed in part. Plaintiff does not dispute that at some point in time, she forwarded a screenshot of a work related email from Mummert to her assistant store manager, Jason. The remainder of the allegation, including that the exchange occurred on October 16, 2020 and that the email related to bin scanning, is not supported by the record citation. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

43.    On October 20, 2020, Plaintiff texted another store manager in Market 233 about her old co-manager having trouble with online grocery pickup ("OGP"). (Appx.000150, ECK-0760).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

44.    Plaintiff was originally scheduled to return to work from her medical leave of absence on October 18, 2020; but Plaintiff requested – and Walmart approved – an extension of Plaintiff's Leave of Absence for child bonding between October 24, 2020 and December 4, 2020. (Appx.000173 Plaintiff's Disability and Leave Closure correspondence -WM-ECK0000232; Appx.000175, WM-ECK0000114; Appx.-000024, Pl Dep. 98:15 – 21).

**RESPONSE:** Undisputed.

45.    Plaintiff returned to work on December 7, 2020. (Appx.-000024, Pl. Dep. at 98:15 – 98:21).

**RESPONSE:** Undisputed.

46.     On December 16, 2020, Mummert texted Plaintiff to ask how she was feeling and how things were going after Plaintiff and her baby were diagnosed with COVID; which Plaintiff testified was simply a "common courtesy." (Appx.000137, ECK-0697; Appx.000082-83, Pl. Dep. at 311:21 – 312:12).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

47.     On December 20, 2020, Mr. Mummert again texted Plaintiff to see how she was feeling and how things were going. (Appx.000137, ECK-0697).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

48.     In January 2021, Mummert informed Plaintiff about Care.com a babysitting website that other market team members used if they needed assistance with child care. (Appx.00087, Pl. Dep. at 319: 2-24).

**RESPONSE:** Disputed as stated. At the record citation, in response to being asked whether Mummert ever said anything negative to her about her pregnancy, Plaintiff testified that when she reminded Mummert of a pre-planned work absence which had been on the books since before her maternity leave due to her newborn daughter's daycare being closed, Mummert suggested that she find a babysitter on Care.com instead. Deposition Transcript of Karle Eck ("Eck Tr.") 318:24-319:24 (S-APPX000198-199).

e.      **Subpar Conditions at Store 2334 Before and After Plaintiff's Maternity Leave and Annual Evaluations**

i.      Fiscal Year 2020 (February 1, 2019 – January 31, 2020) Lancaster Store Conditions

49.     For the entirety of Plaintiff's tenure as Store Manager, the Lancaster Store was a high-shrink store where the store's inventory outpaced the sales growth.  (Appx. 000042, Pl. Dep. at 181:24-19; Appx.000180, WM-ECK00001416, Appx.000208 WM-ECK00001063).

**RESPONSE:** Disputed as stated. Plaintiff does not dispute that the Lancaster store was a high-shrink store. However, any implication that Plaintiff's management caused Lancaster's high-shrink status is specifically disputed. The Lancaster store was a high-shrink store prior to Plaintiff's tenure. Eck Tr. 182:11-16 (S-APPX000169).

50.     On July 8, 2019, Plaintiff's Lancaster Store did not meet Walmart's standards for its safety and environmental compliance assessment. (Appx.000181-183, July Safety and Environmental Compliance Assessment - WM-ECK0002827-2829).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that on July 8, 2019, the Lancaster store received a red score for safety compliance. The red score for safety compliance was in contrast to the two pervious compliance assessments on which the Lancaster store received a green score indicating that it met Walmart's standards. Plaintiff specifically disputes that on July 8, 2019, the Lancaster store "did not meet Walmart's standards" for environmental compliance. The Lancaster store received a green score for environmental compliance as it did on the two previous environmental assessments.

16

51.    The Lancaster Store failed to meet Walmart standards because fire extinguishers were not inspected in June 2019. (Appx.000182, July 2019 Safety and Environmental Compliance Assessment - WM-ECK0002828).

**RESPONSE:** Disputed as stated. The Lancaster store received a red safety compliance score because a single fire extinguisher in the store had not been inspected in June 2019.

52.    On July 8, 2019, the same inspector who authored Plaintiff's July Safety and Environment Compliance Assessment found several exceptions and repeat exceptions during Plaintiff's store's sanitation audit, including observed aged soil build up underneath the milk shelves, excessive soil or food build up in the deli display case, and aged soil build up in the hot case. (Appx.000184-187, WM-ECK0000593-596; Appx.000025-29, Pl Dep. at 113:11 – 117:13).

**RESPONSE:** Disputed as stated. Plaintiff does not dispute that the inspector noted several "exceptions" during the July 8, 2019 safety audit. Nevertheless, the Lancaster store received a "green" sanitation score during the visit indicating that the Lancaster store "m[et] Walmart's standards" with respect to sanitation.

53.    On August 24, 2019, Plaintiff's Assistant Store Manager Bryan Beistline emailed Plaintiff to inform her that the "store is really bad right now" because there was freight not being touched and because "[n]o department was 100%." (Appx.000188, WM-ECK 0002527).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Beistline's August 24, 2019 email. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. The document shows that on Plaintiff's day off, her Co-Manager, Beistline, emailed Plaintiff to inform her of the store's poor conditions on that day.

Beistline was responsible for the Lancaster store on that day. <u>Deposition Transcript of Randall Mummert ("Mummert Tr.")</u> 8:20-9:5 (S-APPX000207-208).

54.    In January of 2020, the Lancaster Store's inventory outpaced its sales, resulting in high shrink. (Appx.000060-61, Pl. Dep. at 250:23 – 251:16).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that in January 2020, the Lancaster store's inventory outpaced its sales. The record citation does not support the remainder of the allegation, including that the Lancaster store experienced "high shrink" in January 2020.

55.    During January 2020, Plaintiff's store was undergoing a department remodel. (Appx.000038, Pl. Dep. At 148:15 – 148:21).

**RESPONSE:** Undisputed.

56.    On January 15, 2020, at 9:33 a.m., Joshua Mitchell ("Mr. Mitchell"), Field Project Manager of the remodel, emailed Mummert pictures of his team's working conditions in Plaintiff's store and complained that the store was not maintaining the standard and, consequently, the work that his team was completing was not even recognizable as completed after two days. (Appx.000189-201, Store Remodel Email Chain - WM-ECK0002280-2292).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the Store Remodel Email Chain. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

57.    On January 15, 2020, Region 22 Vice President Ann-Louise Almeida ("Ms. Almedia"), Mr. Mummert's direct supervisor, emailed Mr. Mummert to state that Josh Mitchell's photographs were "beyon[d] horrible" and "were escalated all the way up through the home

18

office." (Appx.000202, Store Remodel Email Chain- WM-ECK0002310; Appx.000039 Pl. Dep. at 157:8-12).

**RESPONSE:** Disputed in part and as stated. The cited deposition testimony from Plaintiff does not support the allegation. Plaintiff testified at the record citation that she did not know if the pictures were of her store. Eck Tr. 157:8-12 (S-APPX000165). Plaintiff disputes Defendants' characterization of the Store Remodel Email Chain. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. Notably, in response to Almeida's email, Mummert disagreed that the photos sent by Mitchell were representative of the Lancaster store, explaining: "I was there last week and did not see any these [issues]. I even had [Co-Manager] Bryan call me and tell me on Sunday how well zoned the store including apparel."

58.    Plaintiff testified that it was her responsibility to make sure that the issues identified in the photos sent by Mr. Mitchell were remediated and that the store was presentable for customers. (Appx.000040, Pl. Dep. at 163:1 – 163:7).

**RESPONSE:** Disputed. The record citation does not support the allegation. At the record citation, Plaintiff testified that if she observed conditions like those depicted in Mitchell's photos, she would assign associates to fix the issue.

59.    On Plaintiff's Fiscal Year ("FY") 2020 Annual Performance Evaluation, delivered by Mr. Mummert on February 28, 2020, Mr. Mummert's overall rating for Plaintiff's performance was "Improvement Needed." *(*Appx.000203-207, Plaintiff's FY20 Annual Performance Evaluation, Bates-stamped WM-ECK0000061-65).

**RESPONSE:** Undisputed that shortly after Plaintiff informed Mummert of her pregnancy and intention to take FMLA-qualifying maternity leave, she received her first ever "Improvement Needed" performance rating.

60.    The 2020 Fiscal Year Performance Evaluation concerned Plaintiff's work performance in 2019.  (Appx.000030, Pl. Dep. at 135:19 – 135:23)

**RESPONSE:** Undisputed.

61.    The stated bases for Plaintiff's Improvement Needed rating included Plaintiff's consistency issues in key areas of store standards, store process, and talent development. (Appx.000203, Plaintiff's FY20 Annual Performance Evaluation, - WM-ECK0000061).

**RESPONSE:** Plaintiff specifically disputes that the "bases" identified in her 2020 Fiscal Year Performance Evaluation were the true reasons for her "Improvement Needed" rating.

**Q: Do you have any reason to dispute [the "Improvement Needed" rating]?**

**A: I do. I was unaware that I had all of these issues until this evaluation. …**

**Q: Do you think Mr. Mummert was misrepresenting your performance for 2019?**

**A: I do.**

**Q: Any why do you think that?**

**A: Because ever since I told him that I was starting IVF and I was pregnant, I feel like he put a target on my back, and that evaluation would have been written right at that time I told him I was pregnant.**

Eck Tr. 136:16-137:21 (S-APPX000153-154).

        ii.    <u>Fiscal Year 2021 (February 1, 2020 – January 31, 2021) Lancaster Store Conditions</u>

62.     From February 1, 2020, to July 13, 2020, Plaintiff's store had fifteen (15) safety accidents; Plaintiff testified that fifteen (15) accidents were the highest total in Market 233. (Appx.000049, Pl. Dep. at 219:10 – 219:14).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that Walmart's internal documents report that from February 1, 2020 through July 13, 2020, the Lancaster store had fifteen (15) safety accidents. Plaintiff disputes that she "testified" that this was the highest total in Market 233. During her deposition, Plaintiff testified that she did not know whether other stores were accurately reporting accidents. <u>Eck Tr.</u> 219:15-23 (S-APPX000173).

63.     On June 23, 2020, Beistline explained to Mummert why there was a lack of bin scans in certain departments and why the total scans were below the goal of 95%. (Appx.000209, WM-ECK0000601).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Beistline's June 23, 2020 email. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

64.     On July 20, 2020, Market Asset Protection Manager Jennifer O'Brien advised Eck that the Lancaster Store's perpetual inventory had increased by $16,000, creating a negative impact on PI management, and asked Eck how she was reacting to the trends of losses in her store and whether she had narrowed down what part of the process overview was being missed. (Appx.000210, WM-ECK001736).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of O'Brien's July 20, 2020 email. It is a document which speaks for itself and Plaintiff is entitled to all inferences

arising from the document. Plaintiff specifically disputes that O'Brien's questions were directed to Plaintiff in particular.

65.    By August 7, 2020, Plaintiff's store had seventeen (17) accidents; Plaintiff testified that seventeen (17) accidents were the highest total in Market 233. (Appx.000050, Pl. Dep. at 222:9 – 222:15).

**RESPONSE:** Undisputed.

66.    Plaintiff testified that if her store continued to have an excessive amount of accidents that it could be costly for Walmart's profit. (Appx.000050 Pl. Dep. at 222:16 – 222:20).

**RESPONSE:** Undisputed.

67.    During 2020, the Lancaster Store had late turnovers on modulars on multiple occasions. (Appx.000041, Pl. Dep. at 167:8 – 167:11).

**RESPONSE:** Undisputed.

68.    For example, on June 5, 2020, Plaintiff emailed one of her employees to state that for the third week in a row there were late modulars in her area. Eck complained to the employee that for the third week in a row there were late mods in the employee's area with "no plan to complete them."  Eck stated that she could not continue to talk about the late mods when mods can be planned out weeks in advance.  (Appx.000211, WM-ECK0001658, Appx. June 5, 2020, Email from Plaintiff, WM-ECK0001658).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Plaintiff's July 20, 2020 email. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. Plaintiff specifically disputes that she was "complaining" to an

employee. The email was a "personal discussion" email (*i.e.*, the first step of Walmart's progressive discipline process). Deposition Transcript of Bryan Beistline ("Beistline Tr.") 23:7-14 (S-APPX000296).

69.     On January 27, 2021, Beistline informed the Lancaster Team that the Lancaster Store would be having a visitor on January 28, 2021 and all pallets needed to be off the sales floor. (Appx.000212, WM-ECK0001661).

**REPSONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Beistline's January 27, 2021 email. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. Notably, in his email, Beistline acknowledges that "sacrifice[s]" to the processing of freight/maintenance of the backroom would need to be made to ensure that the Lancaster store floor was in good condition for the visit.

              iii.      Fiscal Year 2022 (February 1, 2021 – January 31, 2022) Lancaster Store Conditions

70.     Plaintiff testified that in early 2021, her store also had thirty-plus (30+) trailers of merchandise at her store and excess freight in her backroom. (Appx.000062-63, Pl. Dep. at 253:17 – 254:6).

**RESPONSE:** Disputed as stated. At the record citation, Plaintiff testified as follows:

    **Q: Why would there by merchandise in the backroom that wasn't binned correctly?**

    **A: Because of the excessive amount of freight that was left for me when I was on leave, I didn't receive any help. I could not catch up. …**

    **Q: When did you have 30 trailers? …**

    **A: They arrived while I was on leave, and were full when I came back from leave.**

Eck Tr. 253:17-254:17 (S-APPX000180-181).

71.     On February 5, 2021, Bryan Beistline e-mailed Eck and stated, "We are hurting again in the grocery backroom …. there is freight, a lot of junk, and it's verry messy.  Can you try to assemble a team tomorrow to dedicate to try and get it back to respectable for me?" (Appx.000213, WM-ECK0000599).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Beistline's February 5, 2021 email. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

72.     On March 21, 2021, Beistline advised Eck that there were four pallets of old freight that was left in consumables as of that date.  (Appx.000214, WM-ECK0000600).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Beistline's March 21, 2021 email. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

73.     On March 24, 2021, Bryan Beistline informed the Lancaster Team that the Store's bin scan percentage had decreased to 74% and requested a plan of action to get the percentage up to 95%.  (Appx.000215, WM-ECK0001678).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Beistline's March 24, 2021 email. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. Plaintiff specifically disputes any implication that Beistline's email was requesting a "plan of action" from Plaintiff.

74.     On April 23, 2021, Grace Misner, an Associate at Plaintiff's store, informed People Operations Lead Jessica Santiago ("Ms. Santiago") that "communication is not the strong suit here at 2334." (Appx.000216, April 23, 2021, Email from Grace Misner, WM-ECK0002238).

24

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Misner's April 23, 2021 email. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

75.     On April 23, 2021, Brian Beistline informed Lancaster Store Team Leads that they needed to start clearing out the backroom in front of claims, starting with the pallets on the floor and in top steel; and he also advised that they need to make a "huge push" on getting apparel and shoe freight worked every night.  (Appx.000217, WM-ECK0001676).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Beistline's April 23, 2021 email. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

76.     Plaintiff testified that there were pallets "everywhere on" her store's floor. (Appx.000066, Pl. Dep. at 259:9-11).

**RESPONSE:** Disputed as stated. Plaintiff testified at the record citation that there were pallets everywhere on the Lancaster store's floor due to the freight buildup that accumulated while she was on maternity leave. Eck Tr. 258:23-259:11 (S-APPX000183-184).

77.     On May 20, 2021, Walmart Director, Customer Service, Aaron Kimbrough emailed Mr. Mummert to inform him that during a visit to Plaintiff's store on May 15, 2021, he encountered two to three customers waiting near checkout appearing unhappy and that all the customers left due to the wait. (Appx.000218-219, May 20, 2021, Email from Aaron Kimbrough, WM-ECK0000504).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Kimbrough's May 20, 2021 email. It is a document which speaks for itself and Plaintiff is entitled to all

25

inferences arising from the document. Plaintiff disputes any implication that she was responsible for the issue observed by Kimbrough, which related to the electronics department "checkout" in particular and occurred on a day when Plaintiff was not in the store. *See* May 20, 2019 Kimbrough Email (S-APPX000001). On the same day that Kimbrough's email was received, Plaintiff investigated the issue (including, without limitation, through review of surveillance footage), and determined that the electronics associate had left the store that day without notice due to the passing of a family member. *Id*. Plaintiff promptly responded to Kimbrough, explaining the results of her investigation, and assured him that she would address the issue with the associates and managers who were on duty that day. *Id*. Notably, Kimbrough did not raise any other concerns regarding the condition of the Lancaster store in his email to Mummert. *Id*.

78.    Plaintiff testified that a customer interaction in which a customer was at the store and was not served would have a negative consequence on the store. (Appx.00080-81, Pl. Dep. at 294:24 – 295:4).

**RESPONSE:** Undisputed.

79.    Plaintiff did not think it was fair to hold any of her team members accountable for the excess freight that was built up in the Lancaster Store.  (Appx.000078-79, Pl Dep. at 287: 17 – 288:8).

**RESPONSE:** Disputed as stated. At the record citation, Plaintiff testified that when she returned from her maternity leave, she did not hold her team members accountable for the freight buildup that accumulated while she was on leave, particularly because her team were "going in negative hours". As Plaintiff explained: "[i]f my TLE manager was out on leave and they had accidents,

and he came back and now he has high accidents I wouldn't hold him accountable for those high accidents." <u>Eck Tr.</u> 287:17-288:13 (S-APPX000192-193).

80.     On July 14, 2021, Brian Beistline advised the Lancaster Team that there was a bit of confusion on process direction, especially with ON (overnight) and into first shift.  Beistline stated that there was no reason and no excuse for the Store not to be cleaned and zoned every night. (Appx.000220-221, WM-ECK0001680-81).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Beistline's July 14, 2021 email, which is incomplete. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

81.     On July 19, 2021, Store Coach Gwen Rivera complained to her Team that they were failing in toy modulars as there were "several pallets sitting in the back because these mods are not set, leaving our shelves empty."  (Appx.000222, WM-ECK0001518).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Rivera's July 19, 2021 email, which is incomplete. For example, Defendants omitted the first two sentences of the email which read: "Team you have done an awesome job teaming up on MOD's. I greatly appreciate the huge push." Plaintiff further disputes any implication that Rivera's email was directed towards her in particular. Rivera's July 19, 2021 email is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

82.     On July 25, 2021, Coach Gwen again informed her team that there were eleven toy mods that needed to be completed and complained that there were "multiple pallets just sitting on the floor in general merchandise awaiting a home and in the meantime our shelves are empty." (Appx.000223, WM-ECK0001519).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Rivera's July 25, 2021 email, which is incomplete. Plaintiff further disputes any implication that Rivera's email was directed towards her in particular. Rivera's July 19, 2021 email is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

### f.   Mr. Mummert and the Market 233 Management Team Assisted Plaintiff's Store

83.    On June 26, 2020, prior to Plaintiff's maternity leave, Mr. Mummert instructed Plaintiff to send a slideshow of her store's condition to Ms. Almeida because he thought it would help Plaintiff's reputation with Regional leadership given the struggles with her store over the prior year. (Appx.000102-103, Mummert Dep. at 54:18 – 55:10).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Mummert's testimony. Plaintiff specifically disputes that Mummert "instructed" her to send the June 26th email to Almeida to "help Plaintiff's reputation with Regional leadership". The record citation does not support those portions of the allegation. Plaintiff also disputes Defendants' characterization of Mummert's testimony. At the record citation, Mummert testified that he talked to Plaintiff before she sent the June 26th email and "encouraged" her to do so because he was "very proud" of the "great success [Plaintiff] had".

84.    Market Asset Protection Lead Jennifer O'Brien had weekly AP Touch Base Conference Calls with Eck to address the Store's performance for safety planning, shrink intervention planning, bin scanning, and register closure breakdowns.  (Appx.000224-259, WM-ECK0000788-823).

**RESPONSE:** Disputed as stated. O'Brien had weekly AP Touch Base Conference Calls with the management teams of all stores that she oversaw.

85.    O'Brien also sent to Eck and all Store Managers in Market 233 weekly Process Overview e-mails to inform Store Manager of each Store's metrics for perpetual inventory and bin scanning.  (Appx.000043, Pl. Dep. 190:11-23).

**RESPONSE:** Undisputed.

86.    Market People Operations Lead Jessica Santiago sent weekly People Operations Scorecards to Market 233 Store Managers that identified talent levels and workforce planning metrics at each store within the Market. (Appx.000260-261, WMECK0002661-2662).

**RESPONSE:** Undisputed.

87.    On April 10, 2021, Plaintiff's store had the highest full time Associate ratio in the entire Market at 70.57% and 283 active Associates. (Appx.000262, WMECK0002663).

**RESPONSE:** Undisputed.

88.    Plaintiff testified that during 2021, "[t]here were so many associates being hired" that she did not talk to every associate about her store's safety incentive plan. (Appx.000074, Pl. Dep. at 282:3 – 282:4).

**RESPONSE:** Disputed as stated. Plaintiff does not dispute that she did not speak with every associate about the Lancaster store's safety incentive plan. Plaintiff disputes any implication that this was a failure on her part. As Plaintiff testified, "making sure associates were knowledgeable of the safety plan" did not fall under her job responsibility. The People Lead was responsible for

covering this information with newly hired associates during orientation. <u>Eck Tr.</u> 281:20-282:8 (S-APPX000190-191).

89.    On January 3, 2021, Market Digital Operations Lead Debora Peasley ("Ms. Peasley"), texted Plaintiff and stated that, "I do understand that you are struggling with staffing and I reduced you to 100 orders." (Appx.000126, ECK-00091).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. At the record citation, Peasley's stated:

> **Team,**
> **I am concerned about the late picks.**
> **I do understand that you are struggling with staffing and I reduced you to 100 orders.**
> **I see we have 11 shoppers-but to help get you caught up you need to have associates clear the late picks first.**

In response, Plaintiff stated:

> **Looking at the roster we have everyone over there. Even pulled people from service areas now taking people from out in the auto shop. Next to pull is fresh associates or cashiers off the front end**

90.    Later on January 3, 2021, Ms. Peasley texted Plaintiff, "[i]f I could I would close more slots but you are capped out today." (Appx.000126, ECK-00091).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

91.     On March 2, 2021, "Ms. Peasley", texted Plaintiff to ask her thoughts on closing open online grocery pick up slots because Plaintiff's store was at 164 orders; but Plaintiff responded that her store was "good with the time slots as is." (Appx.000125, ECK-00088).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text message exchange. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

92.     Between March 2020 and August 2021, Debora Peasley and Mummert temporarily shut down the entire Online Pickup and Delivery Department on more than 250 separate occasions for multiple hours to free up additional associates to work freight or work in other areas of the Lancaster Store.  (Appx.000265, Deborah Peasley Declaration at ¶7; WM-ECK0002815).

**RESPONSE:** Disputed. The record citations do not support the allegation. Plaintiff specifically disputes that "the entire" Online Pickup and Delivery Department of the Lancaster store was shut down on any occasion between March 2020 and August 2021, let alone "250 separate occasions." The document cited by Defendants, WM-ECK0002815 ("Slot Closure Spreadsheet"), depicts instances where Walmart closed open online grocery timeslots. The vast majority of the slot closures depicted in the Slot Closure Spreadsheet lasted for three (3) hours or less. *Id*. When slots were closed, existing orders were not cancelled and the department was not "shut down". Eck Tr. 240:7-22 (S-APPX000174). Plaintiff specifically disputes that the slot closures were exclusively "to free up additional resources to work freight or work in other areas of the Lancaster store." The reasons for slot closures included (without limitation): accidents, power outages, civil unrest, covid, remodel, staffing, store events, weather, snow/ice, GIF issues, pick path issues, and staffing. *Id*. Plaintiff also specifically disputes any implication that the closure of unclaimed online grocery

slots for a couple of hours at a time constituted favorable treatment of Plaintiff. When other stores were struggling with freight, Peasley shut down the online grocery department for multiple days. Eck Tr. 240:16-22 (S-APPX000174). When another Store Manager, Bryan Vance, was struggling with excess freight and staffing issues, Peasley and Mummert instituted a "forced reduction" of online grocery orders lasting approximately six (6) weeks. Deposition Transcript of Deborah Peasley ("Peasley Tr.") 50:11-18; 52:8-12 (S-APPX000313-317). Notably, Bryan Vance was never disciplined because the freight buildup which necessitated the forced reduction because it accumulated during a time when he was not the manager of the store and, according to Peasley, it would be "unfair" to hold him accountable for issues that he "inherited". Peasley Tr. 63:23-64:6; 69:2-12 (S-APPX000313-317).

93.    On March 29, 2021, Mummert sent Plaintiff, Store 5200 Manager Lance Ransom ("Mr. Ransom") and a team of Associates to assist at her store. (Appx.000142  ECK-00707).

**RESPONSE:** Undisputed.

94.    Plaintiff testified that Mr. Mummert sent team members to help at Store 2334. (Appx.000058, Pl. Dep. at 247:7 – 247:11).

**RESPONSE:** Disputed as stated. At the record citation, Plaintiff testified as follows:

> **Q: Do you have any reason to dispute that you failed to develop an effective plan to deal with freight?**
>
> **A: I do.**
>
> **Q: And why do you dispute that?**
>
> **A: Because you can't have an effective plan if you are short in hours. I can plan like crazy, but if there's no one there, who is going to get it done? I'm negative hours, and that what I was explaining to Randy that I needed help. I was in the hole when he let the store fall in disarray while I was on maternity leave. I came back and due to being on leave, I was not allowed to get any help. He wouldn't assist me. And then he just**

**started holding me accountable, and he threw some help my way just to put on record that, yeah, I sent her a few team members here and there. This should be good, but it didn't make a dent. Those managers even told Randy, this is not going to be enough to catch the store up. And that was it.**

Eck Tr. 246:15-247:14 (S-APPX000175-176).

95.    Market 233 also permitted Plaintiff to request overtime from Mummert or from Market Coordinator Kayla Royce ("Royce") for her store's associates. (Appx.000270, at WM-ECK0001412).

**RESPONSE:** Disputed as stated. Plaintiff does not dispute that she, like all other Store Managers in Market 233, was permitted to request overtime. Plaintiff also specifically disputes any implication that being permitted to request overtime constituted favorable treatment of Plaintiff. Plaintiff further disputes any implication that the approval of overtime hours by Mummert would in and of itself alleviate the challenges faced by Plaintiff and other store managers in Market 233. *See* Mummert Tr. 113:10-15 (Q: So if there is a situation where the store may require or would want overtime to address an issue, you still need the employees to raise their hand and say yes, I'm willing to do it? A: Yes, that's correct) (S-APPX000243).

96.    On November 29, 2019, shortly after informing Mummert of her pregnancy, Plaintiff requested (and Mummert approved) 550 hours of overtime for her store. (Appx.000132-133, at ECK-0651-52).

**RESPONSE:** Disputed as stated. Plaintiff does not dispute that she, like all other Store Managers in Market 233, was permitted to request overtime. Plaintiff also specifically disputes any implication that being permitted to request overtime constituted favorable treatment of Plaintiff. Plaintiff further disputes any implication that the approval of overtime hours by Mummert would in and of itself alleviate the challenges faced by Plaintiff and other store managers in Market 233.

*See* <u>Mummert Tr.</u> 113:10-15 (Q: So if there is a situation where the store may require or would want overtime to address an issue, you still need the employees to raise their hand and say yes, I'm willing to do it? A: Yes, that's correct) (S-APPX000243).

97.    On April 11, 2021, Royce again asked Plaintiff and the other Market 233 store managers to submit requests for overtime. (Appx.000270, at WM-ECK0001412).

**RESPONSE:** Disputed as stated. Plaintiff does not dispute that she, like all other Store Managers in Market 233, was permitted to request overtime. Plaintiff also specifically disputes any implication that being permitted to request overtime constituted favorable treatment of Plaintiff. Plaintiff further disputes any implication that the approval of overtime hours by Mummert would in and of itself alleviate the challenges faced by Plaintiff and other store managers in Market 233. *See* <u>Mummert Tr.</u> 113:10-15 (Q: So if there is a situation where the store may require or would want overtime to address an issue, you still need the employees to raise their hand and say yes, I'm willing to do it? A: Yes, that's correct) (S-APPX000243).

98.    On April 25, 2021, Royce emailed Plaintiff and other Market 233 store managers to ask for their overtime requests. (Appx.000273, at WM-ECK0001410).

**RESPONSE:** Disputed as stated. Plaintiff does not dispute that she, like all other Store Managers in Market 233, was permitted to request overtime. Plaintiff also specifically disputes any implication that being permitted to request overtime constituted favorable treatment of Plaintiff. Plaintiff further disputes any implication that the approval of overtime hours by Mummert would in and of itself alleviate the challenges faced by Plaintiff and other store managers in Market 233. *See* <u>Mummert Tr.</u> 113:10-15 (Q: So if there is a situation where the store may require or would

want overtime to address an issue, you still need the employees to raise their hand and say yes, I'm willing to do it? A: Yes, that's correct) (S-APPX000243).

99.    Plaintiff testified that she "requested a lot of overtime often during the time that [she] came back from leave." (Appx.000046, Pl. Dep. at 213:2 – 213:9).

**RESPONSE:** Undisputed.

100.    Plaintiff testified that there were no negative consequences for her requesting and using more overtime than she was approved for. (Appx.000046, Pl. Dep. at 213:7– 215:5).

**RESPONSE:** Undisputed.

101.    On March 30, 2021, Mummert e-mailed the entire Market 233 Team to provide advance notice of his visits to stores to conduct his checklist tour as part of his inspection of store conditions.  Mummert informed Eck that he planned to conduct his checklist tour at Store 2334 on April 7, 2021.  (Appx.000275-276, WM-ECK0001655-56).

**RESPONSE:** Undisputed.

102.    On April 5, 2021, two Associates from Ransom's store were again sent to assist Plaintiff's store. (Appx.000151, ECK-00814).

**RESPONSE:** Undisputed.

103.    In response to Mummert's March 30, 2021 e-mail, Eck informed her team on April 6, 2021, that Mummert would be walking the Lancaster Store the following morning and they could not have any pallets on the salesfloor.  (Appx.000275-276, WM-ECK0001655-1656).

**RESPONSE:** Disputed as stated. The cited email is a document that speaks for itself and Plaintiff is entitled to all inferences arising from the document.

104.    Mummert additionally texted Plaintiff on the following dates offering assistance, support, encouragement, or asking how Plaintiff was doing after her return from maternity leave:

a. 12/14/2020 – Offering to assist Plaintiff with store orders. (Appx.000137 ECK-00697).

b. 1/14/2021 – Assisting Plaintiff with sign placement. (Appx.000138-139, ECK-00699-700).

c. 1/16/2021 – Responding "Ok. No worries" when Plaintiff informed him that she would be out because her babysitter closed down due to COVID. (Appx.000140, ECK-00701).

d. 2/1/2021 – Asking Plaintiff, "R u ok[?]" (Appx.000141, ECK-00702).

e. 3/29/2021 – Asking if team of Associates arrived to assist at her store. (Appx.000143, ECK-00708).

f. 4/3/2021 – Asking Plaintiff, "How is it going[?]" (Appx.000144, ECK-00709).

g. 4/12/2021 – Telling Plaintiff, "U Are good" after Plaintiff responded to a customer emergency. (Appx.000145, ECK-0712).

h. 4/16/2021 – Closing Plaintiff's store down to 50 online orders for two days that week. (Appx.000146, ECK-00713).

i. 5/9/2021 – Wishing Plaintiff a "Happy Mother's Day to a super hero mom." (Appx.000147-148, ECK-00714-715).

j. 5/13/2021 – Informing Plaintiff of his estimated time of arrival for a visit at her store. (Appx.000148, ECK-00715)

k. 6/2/2021 – Texting Plaintiff, "I just heard. I hope all is well" after learning of Plaintiff's mother's cancer diagnosis. (Appx.000149, ECK-00716).

36

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of the cited text messages. These are documents which speaks for themselves and Plaintiff is entitled to all inferences arising from the documents.

### g.    Plaintiff's Disciplinary History

105.    On April 6, 2021, Mummert administered a Yellow Coaching to Plaintiff for failing to build an effective plan to ensure the store freight was worked, binned, and validated daily, failing to execute market direction from store tours and follow up on daily cleaning checklist, leading to poor standards that impacted shrink and process execution. (Appx.000277, Plaintiff's Disciplinary Action History, B WM-ECK0000082).

**RESPONSE:** Disputed. Plaintiff disputes that her Yellow Coaching was administered on April 6, 2021. It was administered on March 25, 2021. Eck Tr. 265:23-266:1 (S-APPX000188-189). Plaintiff specifically disputes that she was given a Yellow Coaching for the reasons set forth in this paragraph. Plaintiff was given a Yellow Coaching because of her pregnancy and because she took maternity leave. Eck Tr. 261:3-6 (S-APPX000185-186).

106.    Mummert reported in the Yellow Coaching: "The lack of timely follow-up leads to poor execution, even with a plan.  Karle's poor standards and lack of merchandise being accounted for in her store is impacting shrink and process execution.  Karle continues to struggle with following up and effective planning to achieve desired results."   (Appx. 000277; WM-ECK0000082).

**RESPONSE:** Disputed as stated. Plaintiff does not dispute that the quoted language appears in her Yellow Coaching, which is a document that speaks for itself. Plaintiff disputes any implication that she was issued the Yellow Coaching for the reasons set forth in the document. Plaintiff was

given a Yellow Coaching because of her pregnancy and because she took maternity leave. Eck Tr. 261:3-6 (S-APPX000185-186).

107.    Plaintiff does not dispute the store conditions documented in her Yellow Coaching but attributes the issues to staffing shortages, a buildup of freight during her maternity leave, and a lack of assistance from Mummert. (Appx.000057-59, Pl. Dep. at 246:15 – 248:16).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that during her maternity leave, excessive freight accumulated at the Lancaster store and that when she returned from leave, Mummert deprived her of resources and assistance necessary to address the issue. Eck Tr. 246:15-248:16. The record citation does not support the remainder of the allegation, including that "Plaintiff does not dispute the store conditions documented in her Yellow Coaching." *Id.* Plaintiff disputes any implication that she was issued the Yellow Coaching for lawful reasons. Plaintiff was given a Yellow Coaching because of her pregnancy and because she took maternity leave. Eck Tr. 261:3-6 (S-APPX000185-186).

108.    On May 13, 2021, Mummert administered an Orange Coaching to Plaintiff for failing to build an effective plan for late modular and freight, and failing to implement effective processes for freight, stocking, zoning, and bin scanning. (Appx.000279, Plaintiff's Disciplinary Action History, WM-ECK0000084).

**RESPONSE:** Disputed. Plaintiff specifically disputes that she was given an Orange Coaching for the reasons set forth in this paragraph. Plaintiff was given an Orange Coaching because of her pregnancy and because she took maternity leave. Eck Tr. 261:3-6 (S-APPX000185-186).

109.    Mummert reported in the Orange Coaching: "Karle's lack of properly follow[ing] up on freight planning is impacting shrink and process execution.  Karle continues to struggle with

following up and effective planning to achieve desired results and holding her team accountable."
(Appx. 000279, WM-ECK0000084)

**RESPONSE:** Disputed as stated. Plaintiff does not dispute that the quoted language appears in her Orange Coaching, which is a document that speaks for itself. Plaintiff disputes any implication that she was issued the Orange Coaching for the reasons set forth in the document. Plaintiff was given an Orange Coaching because of her pregnancy and because she took maternity leave. Eck Tr. 261:3-6 (S-APPX000185-186).

110.    Plaintiff does not dispute that her store did not effectively process freight daily, stock, zone, and bin. (Appx.000064 Pl. Dep. at 257:10 – 257:19).

**RESPONSE:** Disputed as stated. At the record citation, Plaintiff testified that as of the time she received the Orange Coaching, the Lancaster store was not effectively processing freight daily because had "not caught up from the mess" that accumulated in the store during her maternity leave. Eck Tr. 257:10-24. Plaintiff disputes any implication that she was issued the Orange Coaching for lawful reasons. Plaintiff was given an Orange Coaching because of her pregnancy and because she took maternity leave. Eck Tr. 261:3-6 (S-APPX000185-186).

111.    On July 24, 2021, Mummert recommended Plaintiff's termination to Region 22 People Lead Wayne Packer ("Mr. Packer") and Ms. Almedia. (Appx.000281., Plaintiff's Termination Request Email, WM-ECK0001211).

**RESPONSE:** Undisputed.

112.    In Mummert's eight-slide power point presentation supporting the termination recommendation, Mummert highlighted how Plaintiff's store had zoning, cleanliness and merchandise issues during multiple store visits in May, June, and July 2021, the Lancaster Store's

high turnover and call out rates, and the Store's well-documented issues with bin scanning accuracy and freight planning with some bins going 242 days and 217 days without scans, safety issues, and persistent high shrink metrics. (Appx.000282 Plaintiff's Termination Recommendation Power Point Presentation, WM-ECK0000532).

**RESPONSE:** Disputed. Plaintiff disputes Defendants' characterization of Plaintiff's Termination Recommendation Power Point. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. Plaintiff specifically disputes that she was terminated for the reasons set forth in the Termination Recommendation Power Point. Plaintiff was terminated because of her pregnancy and because she took maternity leave. Eck Tr. 261:3-6 (S-APPX000185-186)(S-APPX000185-186).

113.    In preparation for making his Termination Recommendation, Mummert solicited feedback from the Market 233 Management Team on the Lancaster Store's performance during the first and second quarters of 2021, namely from Debora Peasley (Market Digital Operations Lead), Jessica Santiago (Market People Lead), and Asset Protection Operations Lead Jennifer O'Brien, all female employees who worked on Mummert's Market Team. (Appx.000287-289, WM-ECK0000537-539).

**RESPONSE:** Disputed. Plaintiff specifically disputes that Mummert's decision to terminate Plaintiff was based in any way on the "feedback" he solicited from the Market 233 Management Team. Mummert had decided to terminate Plaintiff before soliciting the "feedback". Peasley Tr. 123:21-124:6 (Q: So he said that he was putting things together for Ann-Louise for a termination, right? A: Yes. Q: So he told you that they had already made the decision to terminate Karle? A:

Yeah, they were going to submit all this to Ann-Louise.); 126:32-127:5 (Q: But when he asked you for the information, he told you that it was so that he could provide it to Ann-Louise as part of her termination, right? A: Right. He has to provide a business case to Ann-Louise to support, you know, why he's going to terminate, yes.) (S-APPX000255-258). Plaintiff specifically disputes that she was terminated for the reasons set forth in the Termination Recommendation Power Point. Plaintiff was terminated because of her pregnancy and because she took maternity leave. <u>Eck Tr.</u> 261:3-6.

114.    Mummert's termination recommendation was based in part upon the independent observations of the Market 233 Management Team:

  a.    Deborah Peasley, the Digital Operations Lead, noted in her observations that the Lancaster Store: did not effectively execute its plan for working top stock merchandise, which led to store pickers not finding merchandise in the proper location ("Nil picks" a/k/a not in location picks); the general merchandise department was not zoned as there was merchandise on the floor throughout women, men, and girls wear and throughout the general merchandise department; and the produce area was not properly stocked and ready for business (Appx.000287, WM-ECK0000537; Appx.000068-69, Pl. Dep. 273:14 – 274:3);

  b.    Jessica Santiago, the Market People Operations Leave, noted in her observations that there was a lack of engagement in the store evidenced by a 70.38 % (goal 50%) turnover rate of employees at the store with little to no improvement after several months, a 45.7 % (goal 27%) 90-day employee turnover rate with little to no improvement after several months, the highest call out rate in the market, a failure

to fill open leadership roles, and a failure on the part of Eck to develop talent at the coach position (Appx.000288, WM-ECK0000538; Appx.000069-71, Pl. Dep. 274:19-24; 275:18 – 277:4; 279:10-21); and

c.  Jennifer O'Brien, the Market Asset Protection Operations Lead noted in her observations:  Store 2334 had legacy bins of freight in trailers over 242 days and 217 bins in backroom of the Store with no scans, way of working the freight was not consistently communicated to leadership; the safety plan was not executed consistently with documented follow-up, which led to associates not knowledgeable of the safety incentive plan, which resulted in high accident reviews as the Store for the first and second quarter of 2021; there was minimal improvement from the high-shrink review exceptions  from Q1 22.73% to Q2 at 63.64%. as there were repeated breakdowns with modulars not set on time and properly labeled and zoned, key and door controls not being executed, and shrink plans not being executed by the proper task owners.  (Appx.000289., WM-ECK0000539; Appx. 000350, ¶¶12-14).

**RESPONSE:** Disputed. Plaintiff disputes Defendants' characterization of Plaintiff's Termination Recommendation Power Point. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. Plaintiff specifically disputes that Mummert's decision to terminate Plaintiff "was based" in any way on the feedback contained in the Termination Recommendation Power Point. Mummert had decided to terminate Plaintiff before soliciting the "independent" feedback from other members of the Market 233 management team. Peasley Tr. 123:21-124:6 (Q: So he said that he was putting things together for Ann-Louise for a termination,

right? A: Yes. Q: So he told you that they had already made the decision to terminate Karle? A: Yeah, they were going to submit all this to Ann-Louise.); 126:32-127:5 (Q: But when he asked you for the information, he told you that it was so that he could provide it to Ann-Louise as part of her termination, right? A: Right. He has to provide a business case to Ann-Louise to support, you know, why he's going to terminate, yes.) (S-APPX000255-258). Plaintiff specifically disputes that she was terminated for the reasons set forth in the Termination Recommendation Power Point. Plaintiff was terminated because of her pregnancy and because she took maternity leave. <u>Eck Tr.</u> 261:3-6 (S-APPX000185).

Plaintiff specifically disputes the "observations" of Deborah Peasley contained in the Termination Recommendation Power Point. When asked at her deposition to explain the factual basis for each of the criticisms contained in the document, Peasley could not recall a single specific instance where she observed the alleged issues. Peasley testified that it was possible that her observations occurred while Plaintiff was out on maternity leave and Beistline was in charge of the Lancaster store. <u>Peasley Tr.</u> 130:7-13; 131:2-132:1; 136:7-137:16; 138:14-21; 139:7-14; 141:4-143:15 (S-APPX000259-266). Peasley also testified under oath that Plaintiff was not the lowest performer in the market on any of the OGP metrics that were included on the Termination Request Power Point. <u>Peasley Tr.</u> 168:24-169:7 (S-APPX000267-268).

Plaintiff specifically disputes the "observations" of Jessica Santiago which are hearsay. The Court can only consider Santiago's statements contained within the document (which is itself hearsay) at the summary judgment stage if the proponent of the hearsay, Walmart, demonstrates that Santiago's statements can be introduced in an admissible form at trial – *i.e.*, through testimony from Santiago. Plaintiff made exhaustive efforts to depose Santiago in this case, including (without

limitation) two unsuccessful attempts to serve her with a deposition subpoena. Plaintiff is entitled to all inferences at the summary judgment stage, including the inference that Santiago will not be testifying at the trial in this matter. Because Santiago's hearsay "observations" cannot be introduced in an admissible form at trial, this Court should disregard them for purposes of summary judgment.

115.    Plaintiff does not dispute that Store 2334 had bins not scanned for 242 and 217 days or that Store 2334 was a "high accident" store. (Appx.000072-73, Pl. Dep. at 280:21 – 281:13).

**RESPONSE:** Undisputed.

116.    Plaintiff testified that the Store Manager had the responsibility of developing and executing a freight plan in the store. (Appx. 000076-77, Pl. Dep. at 285:23 – 286:8).

**RESPONSE:** Undisputed.

117.    Plaintiff testified that as a Store Manager, "every single detail would fall under the store manager's umbrella" and "[e]verything under the store would technically fall under the store manager." (Appx.000052, Pl. Dep. at 231:8 – 231:12; Appx.75; Pl. Dep. at 283:4-18).

**RESPONSE:** Undisputed.

118.    Plaintiff testified that it was the Store Manager's role to clear excessive freight from the backroom as part of her general oversight responsibilities for the entire store. (Appx.000046, Pl Dep. at 206: 2-6).

**RESPONSE:** Undisputed.

119.    After a thorough consideration of Mummert's termination recommendation for Plaintiff, Packer and Almeida decided instead that Plaintiff should be administered a Red Coaching

to provide her with additional time to improve her store's performance. (Appx.000108., Mummert Dep. at 205:9 – 205:23).

**RESPONSE:** Disputed. Plaintiff specifically disputes that she was administered a Red Coaching *after* the decision to terminate her was already made "to provide her with additional time to improve her store's performance." Mummert testified that he had never seen an employee survive in terms of employment after receiving a red disciplinary notice and Red Coaching withstanding, he had already concluded that Plaintiff would be terminated "even though we put her on a red disciplinary action". Mummert Tr. 206:20-207:10 (S-APPX000246-247). Furthermore, when Plaintiff was administered the Red Coaching, Mummert told her that she had two weeks to improve but he "kn[e]w it was not going to happen" so she should start looking for a new job. *See* Appendix-000292.

120.    On July 24, 2021, Mr. Mummert administered a Red Coaching to Plaintiff for struggling with timely follow up and building an effective plan for her store, including struggling with freight planning, communication, and associate engagement, leading to high associate turnover and call out rates. (Appx.000290. Plaintiff's Disciplinary Action History, Bates-stamped WM-ECK0000086).

**RESPONSE:** Disputed. Plaintiff specifically disputes that she was given a Red Coaching for the reasons set forth in this paragraph. Plaintiff was given a Red Coaching because of her pregnancy and because she took maternity leave. Eck Tr. 261:21-262:3 (S-APPX000185-186). Plaintiff also disputes that the Red Coaching was a legitimate attempt by Mummert to manage her performance. *See* PSF ¶ 119.

121.    Mummert stated in the Red Coaching:  The store continues to struggle with freight planning through communication and engagement.  It has freight that is not located, which impacts process execution, Online Pickup & Delivery, and shrink….Karle's poor standards and lack of merchandise is impacting the customer and associate experience….By not managing freight flow properly, it is not allowing the Team Leads and Team Associates to accurately correct their perpetual inventory or complete price changes when there is merchandise not binned in the backroom.  This is impacting Ecommerce business." The Store's call-out rate is nearly double the market average.  The 90-day turnover average is 44.8% on a goal of 27%.  Karle also struggles to keep leadership positions full at the store.  She is currently averaging 84% , on a goal of 96%." (Appx.000290-291, WM-ECK000086-87).

**RESPONSE:** Disputed as stated. Plaintiff does not dispute that the quoted language appears in her Red Coaching, which is a document that speaks for itself. Plaintiff disputes any implication that she was issued the Red Coaching for the reasons set forth in the document. Plaintiff was given a Red Coaching because of her pregnancy and because she took maternity leave. Eck Tr. 261:21-262:3 (S-APPX000185-186). Plaintiff also disputes that the Red Coaching was a legitimate attempt by Mummert to manage her performance. *See* PSF ¶ 119.

> **h.    Plaintiff's Internal Complaint, Termination, and Subsequent Investigation**

122.    On Thursday, August 5, 2021, at 9:50 a.m., Plaintiff emailed Sharon Williams, Glenda Fleming Willis, Mummert, Almedia, and Packer to lodge her first Complaint of discrimination against Mummert for her pregnancy and maternity leave. (Appx.000292-293, Plaintiff's Discrimination Complaint email, WM-ECK0000459-460).

**RESPONSE:** Undisputed.

123.    In her email, Plaintiff stated that, "I know that I will more than likely be fired today. Every time I have been coached Market Manager Randy [Mummert] has sneaked into the store when I was off or when he thought I would be gone for the day to walk the store quickly and take pictures. As he was here at 5:30 p.m. on Tuesday night I know that I will be getting fired as this has been the trend." (Appx.000292-293, Plaintiff's Discrimination Complaint email, WM-ECK0000459-460).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of her Discrimination Complaint Email, which is incomplete. It is a document that speaks for itself and Plaintiff is entitled to all inferences arising from the document.

124.    Plaintiff never filed any complaint of discrimination with Walmart prior to her August 5, 2021, email; the same day that she knew it was "more than likely" that she would be fired. (Appx.000090-91, Pl. Dep. at 327:10 – 328:18).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that she filed a complaint of discrimination with Walmart on August 5, 2021, prior to her termination. The record citation does not support the remainder of the allegation, including that "she knew it was 'more than likely' that she would be fired" when she complained.

125.    On the afternoon of August 5, 2021, during a visit to Plaintiff's store, Mummert terminated Plaintiff's employment. (Appx.000294, Plaintiff's Interview Report, WM-ECK0002571).

**RESPONSE:** Undisputed.

126.    Mummert did not see Plaintiff's August 5, 2021 e-mail until after his termination meeting with Plaintiff.  (Appx.000109, Mummert Dep. 213:3-23).

**RESPONSE:** Undisputed that Mummert testified as described.

127.    On Thursday, August 5, 2021, at 5:18 p.m., Mr. Packer informed Plaintiff that Walmart would send her email complaint to its Global Ethics and Compliance team for review. (Appx.000292-293, Plaintiff's Discrimination Complaint email, WM-ECK0000459-460).

**RESPONSE:** Undisputed.

128.    Walmart appointed Global Investigator I, Michele Haigler ("Ms. Haigler") to investigate Plaintiff's discrimination complaint. (Appx.000295-302, Plaintiff's Discrimination Complaint Investigation Report, WM-ECK00002574-2581).

**RESPONSE:** Disputed. Plaintiff disputes that Haigler "investigate[d]" her discrimination complaint. When asked to describe her role at Walmart, Haigler testified:

> It is our role to essentially be a fact finder. We gather information from parties, pertinent parties. We just essentially gather statements from, you know, those that may be involved or have an opinion or perspective. I compile that information into a report and I submit that to the lead case manager. After that, I'm going to be honest with you[,] I don't know what happens after that. I'm not involved in anything that happens after that.

Haigler Tr. 24:15-25:4 (S-APPX000270). Haigler testified that in her role as "investigator", she did not make credibility determinations and was not tasked with determining whether discrimination occurred or whether Plaintiff's termination was justified. Haigler Tr. 55:12-23 (S-APPX000272). Critically, Haigler testified that she did not even read Plaintiff's discrimination complaint email as part of her "investigation." Haigler Tr. 66:13-16 (S-APPX000273).

129.    On August 10, 2021, Plaintiff emailed Mummert and Santiago to ask them to reconsider her request to step down from her Store Manager role into an hourly position and relocate to another store within Market 233, Mummert's market. (Appendix-000303-304, Plaintiff's Request to Step Down Email, WM-ECK0000604-605).

**RESPONSE:** Undisputed.

130.    On August 11, 2021, Mummert responded to Plaintiff's request to step down that he would forward Plaintiff's concern to the regional office. (Appx.000303-304, Plaintiff's Request to Step Down Email, WM-ECK0000604-605).

**RESPONSE:** Undisputed.

131.    Between August 17, 2021, and August 25, 2021, Haigler interviewed Plaintiff, Packer, O'Brien, Santiago, and Mummert as part of her fact investigation. (Appx.000297, Plaintiff's Discrimination Complaint Investigation Report, WM-ECK00002576).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that Haigler interviewed Plaintiff, Packer, O'Brien, Santiago, and Mummert. Plaintiff disputes that Haigler's interviews were an actual investigation of her complaint of discrimination. *See* PSF ¶ 128.

132.    Haigler additionally reviewed Plaintiff's Leave of Absence, Evaluation, and Disciplinary Action History, Store Manager Steven Myers' Disciplinary Action History, Store Manager Curt Shauer's Disciplinary Action History, and Plaintiff's termination documents. (Appx.000297, Plaintiff's Discrimination Complaint Investigation Report, WM-ECK00002576).

**RESPONSE:** Undisputed.

49

133.    On August 26, 2021, Ms. Haigler submitted her investigation report. (Appx.000295, Plaintiff's Discrimination Complaint Investigation Report, WM-ECK0002574).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that on August 26, 2021, Ms. Haigler submitted a document bearing the title "Investigation Report". Plaintiff disputes that Haigler actually investigated her complaint of discrimination. *See* PSF ¶ 128.

134.    Walmart's Global Ethics and Compliance team determined that based on the evidence Haigler collected and summarized, Plaintiff's allegations were not substantiated. (Appx.000305, Plaintiff's Discrimination Complaint Ethics Case Management Details, WM-ECK0000654).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that the final disposition of her discrimination complaint is "unsubstantiated". The remainder of the allegation, including that Walmart's Global Ethics and Compliance team reached this determination based on Haigler's interview summaries, is not supported by the record citation.

135.    Packer communicated to Plaintiff that her discrimination claims were unsubstantiated and that her termination was upheld. (Appx.000095, Pl. Dep. at 334:7 – 334:13).

**RESPONSE:** Undisputed.

### i.    The Decision-Makers

136.    Since 2016, Almeida has worked for Walmart as the Regional Vice President of Region 22, which encompasses Pennsylvania, Delaware, half of New Jersey, and Maryland's Eastern Shore. (Appx.000120, Almeida Dep. at 7:13 – 7:21).

**RESPONSE:** Undisputed.

137.    Almedia oversees 127 Walmart stores in her region. (Appx.000121, Almeida Dep. at 9:14).

**RESPONSE:** Undisputed.

138.    Almeida has three children, two of which she had while working at Walmart. (Appx.000122, Almeida Dep. at 53:2 – 53:5).

**RESPONSE:** Undisputed.

139.    Almeida took maternity leave for the two children that she had while working at Walmart and received a promotion while she out on an extended maternity leave for one of her children. (Appx.000122; 123, Almeida Dep. at 53:6 – 53:9; 62:9-21).

**RESPONSE:** Undisputed.

140.    Mummert started reporting directly to Almeida in 2016. (Appx.000121, Almeida Dep. at 9:2 – 9:4).

**RESPONSE:** Undisputed.

141.    As a Market Manager, Mummert's job performance was rated in part by how well the stores in his market performed. (Appx.000089, Pl. Dep. at 326:16 – 326:19).

**RESPONSE:** Undisputed.

142.    Mummert is also a father to two children. (Appx.000101, Mummert Dep. at 32:22 – 32:23).

**RESPONSE:** Undisputed.

143.    Mummert's wife had a high-risk pregnancy while he worked at Walmart's Harrisburg store. (Appx.000110, Mummert Dep. at 232:2 -232:5)

**RESPONSE:** Undisputed.

III.    **MUMMERT HELD OTHER STORE MANAGERS ACCOUNTABLE FOR STORE PERFORMANCE**

144.    On October 2, 2018, Mummert administered a Yellow Coaching to Store 2205 Manager Kimberly Czarnecki for struggling with store standards and not scanning merchandise into bin locations during multiple store visits. (Appx.000306, Kimberly Czarnecki Disciplinary Action History, WM-ECK0002152).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Kimberly Czarnecki's Disciplinary Action History. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

145.    On December 14, 2018, Store Manager Czarnecki received an Orange Coaching because there had been no marked improvement from her previous coaching. (Appx.000306, Kimberly Czarnecki Disciplinary Action History, WM-ECK0002152).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Kimberly Czarnecki's Disciplinary Action History. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

146.    On or about February 13, 2019, Mummert requested Store Manager Czarnecki's termination because on multiple store visits, Czarnecki's store was below Walmart's standards for

cleanliness and overall store conditions, and merchandise was not worked or located properly. (Appx.000308-314, Kimberly Czarnecki Termination Request Slideshow, WM-ECK0002368).

**RESPONSE:** Disputed. The record citation does not support the allegation, including, without limitation, that Mummert requested Czarnecki's termination or that same occurred on (or about) February 13, 2019. Plaintiff specifically disputes Defendants' characterization of the reasons why Czarnecki's termination was requested. The Kimberly Czarnecki Termination Request Slideshow is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. In reality, the document states that Walmart received "several open doors [*i.e.*, internal complaints from associates] regarding Kim's behavior", that she "yells at the team", and that it took her two months to clean the interview room in her store despite multiple requests, among other things. *See* Appendix-000314.

147.    On March 19, 2019, Mummert administered a Yellow Coaching to Store 2945 Manager Crystal Yeagley for failing to provide her store with the necessary support and follow up to improve overall store performance. (Appx.000315, Crystal Yeagley Disciplinary Action History, Bates-stamped WM-ECK0002054).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Crystal Yeagley's Disciplinary Action History. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. In reality, the document provides the following reason for Yeagley's Yellow Coaching:

> Crystal has failed to provide the necessary support and follow up to improve the overall performance of the store's online grocery pick up process. The store ended FY19 under-performing in key categories. The trend is continuing as in the month of February the results are still not at target. The store's CSAT score averaged 67.9% this year and 67% last year-well below the 95% goal.  The store team averaged an 86% Pre-Sub rate, falling

well-below its 95% target. The on-time pick percentage came in at 65%-also far below the goal of 95%.

Appendix-000315. Notably, Plaintiff's store was performing significantly better on every one of the objective performance metrics cited in Yeagley's Yellow Coaching at the time of each of her disciplinary actions and her termination. *See* <u>July 23, 2021 OGP Metrics</u> (S-APPX000116) (CSAT at 100%; pre-sub rate at 91.3%; and on-time pick rate at 98.2%).

148.    On November 5, 2019, Mr. Mummert himself received a Yellow Coaching from his supervisor, Regional Vice President Ann-Louise Almedia ("Almeida") in part for "allowing his store managers to be excuse driven as to why they can't meet the company expectations." (Appx.000316, Mummert's Disciplinary Action History, WM-ECK0002817).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Mummert's Disciplinary Action History. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

149.    According to Almeida, Mummert received his coaching because he "as a rule of thumb, was generally very slow to deliver a disciplinary action." (Appx.000123A, Almeida Dep. at 64:2 – 64:11).

**RESPONSE:** Disputed in part. Plaintiff does not dispute that Almeida testified consistent with the quoted language when asked if she ever considered that Mummert might have retaliated against Plaintiff. The record citation does not support the remainder of the allegation, including that Mummert received his "coaching" because of this alleged issue.

150.    On March 6, 2019, Mummert administered a Yellow Coaching to Store 2023 Manager Chris Marcheskie, a male, for struggling with store standards and having issues with

merchandise not scanned into bin locations. (Appx.000318, Chris Marcheskie Disciplinary Action History, WM-ECK0002151).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Marcheskie's Disciplinary Action History. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

151.    On November 27, 2019, Mr. Mummert administered a Yellow Coaching to Store 2023 Manager Wynne Cloud, a male, for, in part, having trailers with merchandise that were not scanned into a bin location and leaving product in the backroom. (Appx.000233, Wynne Cloud's Disciplinary Action History, WM-ECK0002151).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Wynne Cloud's Disciplinary Action History. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. Plaintiff specifically disputes that Cloud was issued a Yellow Coaching due to "leaving product in the backroom". The record citation does not support the allegation.

152.    On April 30, 2020, Mummert administered an Orange Coaching to Store Manger Wynne Cloud (male) for poor store standards, lack of planning and follow up with his team, and merchandise not properly scanned into locations. (Appx.000320-341, Wynne Cloud Termination Request Slideshow, WM-ECK0002378, 2388-2408).

**RESPONSE:** Disputed. Plaintiff disputes Defendants' characterization of the Wynne Cloud Termination Request Slideshow. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

153.    On June 16, 2020, Mummert requested Store Manager Cloud's termination to Region 22 People Lead Wayne Packer ("Mr. Packer") and Region 22 Vice President Ann-Louise Almeida ("Ms. Almeida"). (Appx.000320, Wynne Cloud Termination Request Email, WM-ECK0002378).

**RESPONSE:** Undisputed.

154.    The bases for Mummert's termination request for Store Manager Cloud's were Cloud's lack of communication with store associates, the store's call-off and staffing issues, merchandise not scanned into locations, the store not being properly zoned, the cleanliness of the store, and high shrink at the store. (Appx.000320-341, Wynne Cloud Termination Request Slideshow, WM-ECK0002378, 2389-2408).

**RESPONSE:** Disputed. Plaintiff specifically disputes the stated "bases" for Mummert's termination request of Wynne Cloud. Defendants omitted the first nine (9) pages of the Wynne Cloud Termination Request Slideshow which detail no fewer than seventeen (17) internal complaints regarding Cloud including (without limitation) accusations of "verbal abuse, sexual abuse[,] constant threats, racism, sexism and abuse towards people with disabilities"; a "toxic work environment"; "pictures from managers of their genitals"; "bully[ing]"; and "humiliation". Cloud Termination Request Power Point (S-APPX000003).

155.    On September 2, 2020, Mummert administered a Yellow Coaching to Store 4404 Manager Curt Schauer ("Schauer") (male) for failing to build an effective plan to ensure that his store's freight was worked, binned, and validated daily, and for failing to follow up on his daily clean checklist. (Appx.000342, WM-ECK0002643).

56

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Curt Schauer's Disciplinary Action History. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document. Notably, Schauer received **two** Yellow Coachings for "job performance/productivity" – one on November 25, 2019 and another more than nine (9) months later on September 2, 2020 – prior to receiving an Orange Coaching.

156.   On December 24, 2020, Mummert administer an Orange Coaching to Schauer for continuing to struggle with effective planning and for failing to ensure that his store's digital business was meeting customer experience, resulting in his store cancelling over 448 orders. (Appx.000342, WM-ECK0002643).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Curt Schauer's Disciplinary Action History. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

157.   On January 13, 2021, Mummert administered a Yellow Coaching to Academy Store 1529 Manager Steven Myers for his failure to build and follow up on his freight planning process and ensure that current overstock was binned timely, which caused shrink in his store. (Appx.000344, Steven Myers Disciplinary Action History, WM-ECK0002053).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Steve Myers' Disciplinary Action History. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

158.   On September 22, 2021, Academy Store Manager Steven Myers (male) received an Orange Coaching for his failure to effectively plan freight and staff key store areas, and failure to follow up on cleaning and zoning his store, which caused excess freight in the backroom and

adversely impacted shrink and process execution in his store. (Appx.000344, Steven Myers Disciplinary Action History, WM-ECK0002053).

**RESPONSE:** Disputed as stated. Plaintiff disputes Defendants' characterization of Steve Myers' Disciplinary Action History. It is a document which speaks for itself and Plaintiff is entitled to all inferences arising from the document.

159.    Mummert terminated the employment of Store Manager Lance Ransom in February 2023 for subpar conditions at Store Number 5200 including failing to maintain backroom binning and not following up with his team.  (Appx.000104, Mummert Dep. 148:18 – 149:16; 236:12-20).

**RESPONSE:** Disputed in part. Undisputed that Mummert testified as described. However, Defendants did not produce documents during discovery related to Lance Ransom's alleged termination despite their apparent relevance to Defendants' defense. The inference from Defendants' failure to produce these documents is that this did not happen.

## IV.    PLAINTIFF'S DISCRIMINATION CHARGE AND COMPLAINT

160.    On September 2, 2021, Plaintiff filed a Complaint with the Pennsylvania Human Relations Commission ("PHRC") and requested that it be dual-filed with the Equal Employment Opportunity Commission ("EEOC"). (Appx.000345-347, ECK-PHRC001-002).

**RESPONSE:** Undisputed.

161.    In her PHRC Complaint, Plaintiff alleged that Walmart subjected her to discrimination based upon her sex, pregnancy and disability, and retaliation because of her sex and pregnancy discrimination complaints. (Appx.000346, Plaintiff's Document Production, Bates-stamped ECK-PHRC002).

58

**RESPONSE:** Undisputed.

162.    On March 1, 2023, the EEOC issued to Plaintiff a Notice of Right to Sue which informed her that she had ninety (90) days to file a lawsuit in federal or state court. (Appx.000347, Plaintiff's Document Production, Bates-stamped ECK-PHRC532).

**RESPONSE:** Undisputed.


163.    On May 26, 2023, Plaintiff filed a three-count Complaint in the United States District Court for the Eastern District of Pennsylvania alleging violations of Title VII, the Family Medical Leave Act, and Pennsylvania Human Relations Act.  (Doc. 1*Compl.)*

**RESPONSE:** Undisputed.

## STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT

***Plaintiff's eleven (11) year career at Walmart***

164.    Plaintiff began her career at Walmart in September 2010 as a part-time associate in the electronics department at Defendants' Hazelton, Pennsylvania store. Eck Tr. 27:20-28:9 (S-APPX000127-128).

165.    During the seven (7) years following her initial hire, Plaintiff ascended the ranks at Walmart, serving as a full-time hourly associate in several departments, a market assistant, assistant manager, and ultimately, as a co-manager in multiple Walmart stores. Eck Tr. 29:1-46:7 (S-APPX000129-146).

166.    Plaintiff was rated as a "Solid Performer" on every annual performance review she received during her tenure in these roles, the second-highest possible performance rating. Eck Performance History (S-APPX000033).

167.    During her time as Co-Manager at Walmart's Lehighton store, Mummert was Plaintiff's second-level supervisor. Mummert Tr. 7:22-8:1 (S-APPX000206-207).

168.    During his time working with Plaintiff in Walmart's Lehighton store, Mummert observed Plaintiff's "ability to follow up"; her ability to "execute" on store processes and "make good decisions without a lot of guidance"; and her strong delegation skills. Mummert Tr. 7:22-8:19 (S-APPX000206-207).

***Plaintiff's promotion and tenure as Store Manager***

169.    In October 2017, Plaintiff was promoted to the rank of Store Manager at the Lancaster, Pennsylvania store, reporting to Randy Mummert. Mummert Tr. 7:16-21 (S-APPX000207).

170.    At the time he made the decision to promote Plaintiff to the Store Manager position, Mummert was aware that Plaintiff was in her twenties, unmarried, and did not have any children. Mummert Tr. 35:1-14 (S-APPX000210).

171.    Prior to learning of Plaintiff's pregnancy and intention to take maternity leave, Mummert provided Plaintiff with overwhelmingly positive performance ratings and feedback. Eck's 2018 Annual Review (S-APPX000035); Eck's 2019 Annual Review (S-APPX000041).

172.    In 2018, Mummert ranked Plaintiff as a "Solid Performer" on her annual performance review. Eck's 2018 Annual Review (S-APPX000035).

173.    On Plaintiff's 2018 performance review, Mummert identified "ownership and knowledge of the processes/routines" and "planning and organization" as strengths of Plaintiff. Eck's 2018 Annual Review (S-APPX000035).

174.    On Plaintiff's 2018 performance review, Mummert provided the following comments (without limitation):

- "Karle anticipates and probes into the core of problems to determine underlying patterns and root causes and identifies and implements short and long term solutions. Karle is building her store leadership team that is company process driven. She is establishing daily cadence with her team to achieve goals. She holds herself and others accountable for process execution."

- "Karle proactively tours the store to set clear expectations, and goals for her team. She plans for and ensures others have the information, resources, implementation time, and talent needed to accomplish business initiatives."

- "Karle has demonstrated the ability to re-prioritize work and team in a positive way that results in associate buy in and understanding of the 'What and Why'. She quickly prioritized plans in light of changing business needs and drives continuous improvements. She is able to guide her team on work on the right things at the right time."

- "Karle directs her team to focus on company programs that will have positive results with her organization. She is building relationships quickly within her store that is rebuilding trust with the associates and management team. Karle clearly and

61

confidently communicates her thoughts that have positive impacts on her associates. She is rebuilding foundational processes within her store. Karle demonstrates strong managerial courage."

Eck's 2018 Annual Review (S-APPX000035).

175.    In 2019, Mummert ranked Plaintiff as a "Solid Performer" on her annual performance review. Eck's 2019 Annual Review (S-APPX000041).

176.    Prior to learning about Plaintiff's pregnancy, Mummert had never given Plaintiff a performance rating lower than "Solid Performer". Mummert Tr. 45:23-46:2 (S-APPX000219-220).

177.    Prior to learning about Plaintiff's pregnancy and intention to take maternity leave, Mummert had never coached her or subjected her to any formal discipline. Mummert Tr. 45:13-22 (S-APPX000219).

178.    Prior to learning about Plaintiff's pregnancy and intention to take maternity leave, Mummert had never contemplated terminating her employment. Mummert Tr. 45:9-12 (S-APPX000219).

179.    The performance of Store Managers in Market 233 is assessed, in part, based on their stores' performance on Online Grocery and General Merchandise Pickup (OGP) metrics. Termination Request Power Point (Appendix-000282); Deposition Transcript of Steven Myers ("Myers Tr.") 55:8-56:8 (S-APPX000292-293).

180.    The OGP metrics upon which store managers' performance is assessed include: first time pick rate, on-time pick rate, pre-sub, post-sub, on-time delivery, and customer satisfaction. Termination Request Power Point (Appendix-000282); Myers Tr. 55:8-56:8 (S-APPX000292-293).

62

181.    Walmart views the OGP metrics as a "window" into the health of the store and the performance of the store's team. <u>Peasley Tr.</u> 97:20-98:4 (S-APPX000251-252).

182.    Store Managers' annual bonuses are determined, in part, by their store's performance on the OGP metrics. <u>Myers Tr.</u> 55:8-56:8 (S-APPX000292-293).

***Plaintiff's pregnancy announcement and maternity leave***

183.    Plaintiff got engaged and married shortly after her promotion to Store Manager. <u>Mummert Tr.</u> 30:15-18 (S-APPX000209).

184.    In late October or early November 2019, Plaintiff began undergoing fertility treatments which impacted her work schedule. <u>Eck Tr.</u> 138:7-11 (S-APPX000155).

185.    Plaintiff advised Mummert that she was undergoing fertility treatments. <u>Eck Tr.</u> 321:4-11 (S-APPX000200).

186.    When Plaintiff told Mummert that she was undergoing fertility treatments, he commented that it can "take a while" to get pregnant. <u>Eck Tr.</u> 321:4-11 (S-APPX000200).

187.    In January 2020, Plaintiff informed Mummert that she was pregnant and would be taking maternity leave following the birth of her child in August. <u>Mummert Tr.</u> 35:15-18; 36:20-19 (S-APPX000210-211).

188.    At the time he learned of her pregnancy, Mummert understood that Plaintiff would be on maternity leave during the Lancaster store's annual inventory and Black Friday. <u>Mummert Tr.</u> 36:24-40:13 (S-APPX000211-215).

189.    Black Friday and annual inventory are two of the busiest times of the year at Walmart and store managers are generally expected to be present. <u>Mummert Tr.</u> 37:6-9; 39:1-17 (S-APPX000212-214).

190.    Mummert believed that Plaintiff's maternity leave would result in a disruption to the normal flow of business at the Lancaster store. Mummert Tr. 42:6-18 (S-APPX000216).

191.    When he learned that Plaintiff was pregnant with her first child, Mummert considered the possibility that Plaintiff would get pregnant again and take another maternity leave. Mummert Tr. 43:23-44:4; 45:4-8 (S-APPX000217-219).

192.    Prior to Plaintiff, no Store Manager had taken maternity leave during Mummert's tenure in Market 233. Mummert Tr. 43:1-6 (S-APPX000218).

193.    After learning that Plaintiff was pregnant and intended to take maternity leave, Mummert's demeanor towards Plaintiff changed and his treatment of her became markedly worse. Eck Tr. 137:15-21; 138:12-139:8 (S-APPX000154-156). As Plaintiff testified:

> **I know Randy – I could feel that he was upset I was going to be out. I don't think he expected my IVF to happen so quickly. I was lucky enough to get pregnant on the first round, and I was going to be out during the busiest holiday season where the store makes the most money along with the inventory.**
>
> **And then I'm young, I planned on having another kid, and I know that he knew that, so I was going to be out even longer when I have another kid, and I could feel that he was targeting me for that.**

Eck Tr. 141:10-142:4 (S-APPX000158-159).

194.    On February 28, 2020, less than two (2) months after learning that Plaintiff was pregnant and intended to take maternity leave, Mummert rated Plaintiff as "Improvement Needed" on her 2020 annual performance review. Eck 2020 Annual Review (S-APPX000044); Mummert Tr. 51:9-16 (S-APPX000221).

195.    The "Improvement Needed" rating Plaintiff received just months after announcing her pregnancy and intention to take maternity leave misrepresented Plaintiff's performance and

was a total and complete "blindside". <u>Eck Tr.</u> 137:11-14; 140:17-141:4 (S-APPX000154; 157-158).

196.    Prior to receiving the 2020 annual review, Plaintiff had not been coached, counseled, disciplined, or even made aware of any of the alleged performance issues identified in the document. <u>Eck Tr.</u> 136:16-137:4 (S-APPX000153-154).

197.    The 2020 annual review was the first time Plaintiff was rated as "Improvement Needed" during her decade of employment at Walmart. <u>Eck Performance History</u> (S-APPX000033).

***Conditions at the Lancaster store immediately prior to Plaintiff's maternity leave***

198.    Following her pregnancy announcement and before her maternity leave, Plaintiff worked tirelessly to address the issues identified in her 2020 annual review. As Plaintiff testified:

> **I took his feedback from the evaluation and worked on everything that he gave me for the 2020 year.  I made sure that we were pallet free in the backroom.  That's what I worked on pallet free, bin scanning, freight being worked, working on – I was fully staffed I believe then before I went out on leave.  Getting the process complete.  No freight in the backroom bins.  We had – the store looked great prior to me going out on leave. We had no freight in the backroom.  Our top steel was 100 percent empty. Shelves were full, the store was zoned and cleaned.  We were hitting top metrics in a lot of the stuff for the district.**

<u>Eck Tr.</u> 143:21-144:15 (S-APPX000160-161).

199.    On June 26, 2020, mere weeks before she commenced her maternity leave, Plaintiff sent an email to Almeida highlighting the Lancaster store's stellar performance with respect to the OGP metrics, freight flow and related processes, and employee engagement. <u>June 26th Almeida Email</u> (S-APPX000047). For example (and without limitation), as of June 26th, the Lancaster store was:

      a.    The first of twelve stores with all modules 100% completed in the week;

b. The top rated of Mummert's twelve stores in COWM transactions;

c. The top rated of Mummert's twelve stores in VPI participants;

d. The top rated of Mummert's twelve stores in clean cooler cart "minutes used";

e. Consistently above 98.5% in SPARK execution;

f. Consistently in the top two of Mummert's twelve stores in fresh CVP %;

g. On its seventh consecutive week without any late price changes; and

h. Making considerable strides with respect to bin activity, having increased its total store bin execution rate from 17.1% to 92.87% in just two months.

200.    Plaintiff attached a power point slide deck to her June 26th email which contained photographs memorializing the immaculate physical condition of the Lancaster store. June 26th Power Point (S-APPX000050).

201.    Plaintiff sent the June 26th email and slide deck to Almeida, in part, because "[she] could feel that Randy was upset that [she] was proving him wrong in his eval" and "that he couldn't move forward to a coaching." Eck Tr. 144:15-20 (S-APPX000161).

202.    Almeida provided the following response to Plaintiff's June 26th email:

**Karle,**
**WOW!!! WOW!!! WOW!!!. So proud of you and the team. The pictures look amazing. I was so impressed that I sent your email to Mr. Redfield [Almeida's supervisor].** 😊
**I am going to make it a point to get in there before your maternity leave. I am so excited for you and all of [the Lancaster store].**

June 26th Almeida Email (S-APPX000047).

203.    Following receipt of Plaintiff's June 26th email and prior to Plaintiff's maternity leave, Almeida visited the Lancaster store. Eck Tr. 349:15-17 (S-APPX000203-204).

204.    During her visit at the Lancaster store, Almeida marveled at how good the store looked and requested permission from Plaintiff to film a video titled "What Good Looks Like" to distribute to other stores in her region. Eck Tr. 349:18-350:23 (S-APPX000203-204).

205.    Prior to Plaintiff's maternity leave, per Almeida's request, a video was filmed in the Lancaster store highlighting the condition of the store which Almeida told Plaintiff "she was going to show to everybody." Eck Tr. 150:7-23 (S-APPX000164).

206.    At the time that Plaintiff went out on maternity leave, the backrooms of the Lancaster store were pallet-free and had been for more than two (2) months. Mummert Tr. 65:11-66:12 (S-APPX000223-224); Eck Tr. 145:22-146:2 (S-APPX000162-163).

207.    At the time that Plaintiff went out on maternity leave, the backrooms of the Lancaster store were in "excellent" condition. Mummert Tr. 71:2-22 (S-APPX000226).

208.    At the time that Plaintiff went out on maternity leave, there were no pallets on the sales floor at the Lancaster store. Peasley Tr. 117:24-118:2 (S-APPX000253-254).

209.    At the time that Plaintiff went out on maternity leave, the top stock was filled at the Lancaster store. Peasley Tr. 118:3-6 (S-APPX000254).

210.    At the time that Plaintiff went out on maternity leave, the Lancaster store was zoned properly. Peasley Tr. 118:3-6 (S-APPX000254); Mummert Tr. 70:22-71:1 (S-APPX000225-226).

211.    At the time that Plaintiff went out on maternity leave, the Lancaster store was clean. Mummert Tr. 59:19-22 (S-APPX000222).

212.    At the time that Plaintiff went out on maternity leave, there were no trailers on the property of the Lancaster store. Mummert Tr. 96:20-97:2 (S-APPX000238-239); Eck Tr. 169:18-19 (S-APPX000167).

213.    At the time that Plaintiff went out on maternity leave, the Lancaster store was not struggling with freight. Mummert Tr. 100:17-100:24 (S-APPX000240).

214.    At the time that Plaintiff went out on maternity leave, employee engagement was high at the Lancaster store. Mummert Tr. 108:17-23 (S-APPX000242).

215.    At the time that Plaintiff went out on maternity leave, the Lancaster store was outperforming the market average on multiple of the OGP metrics that Market 233 store managers' performance was assessed based on. Mummert Tr. 78:1-87:2 (S-APPX000228-236); August 2, 2020 OGP Metrics (S-APPX000061).

216.    At the time that Plaintiff went out on maternity leave, the market managers were satisfied with the state of Plaintiff's store. Peasley Tr. 117:8-15 (S-APPX000253); Mummert Tr. 76:5-24 (S-APPX000227).

### *Plaintiff's maternity leave*

217.    On August 9, 2020, Plaintiff began her maternity leave. Eck Tr. 93:18-19 (S-APPX000147).

218.    While Plaintiff was out on her maternity leave, her Co-Manager, Bryan Beistline, stepped in and served as the Store Manager of the Lancaster store. Mummert Tr. 101:12-15 (S-APPX000241).

219.    While Plaintiff was out on maternity leave, the Lancaster store began to experience significant issues with freight flow. Mummert Tr. 101:5-7 (S-APPX000241).

220.    The freight flow issues arising during Plaintiff's maternity leave led to an accumulation of excess freight. Beistline Tr. 62:18-22 (S-APPX000299).

221.    As a result of the freight flow issues, the backroom of the Lancaster store became full of freight during Plaintiff's maternity leave. Beistline Tr. 68:24-69:6 (S-APPX000302-303).

68

222.   The backlog of freight became so great that it began spilling onto the sales floor of the Lancaster store. Beistline Tr. 69:8-11 (S-APPX000303).

223.   Eventually, while Plaintiff was out on maternity leave, the Lancaster store began utilizing storage trailers which were set up on the parking lot to store the excess freight. Beistline Tr. 62:18-64:2 (S-APPX000299-301).

224.   While Plaintiff was out on maternity leave, Mummert asked Beistline to create plans of action to address the buildup of freight but Beistline was unable to "fully get ahead of it" because the freight flow was "more than [the Lancaster store] had ever experienced". Beistline Tr. 89:23-90:13 (S-APPX000307-308).

225.   The freight flow issues were further compounded by staffing issues resulting from the Covid-19 pandemic. Beistline Tr. 90:20-23 (S-APPX000308).

226.   While Plaintiff was on maternity leave, two assistant managers were removed from the Lancaster store. Mummert Tr. 216:14-17 (S-APPX000248).

***Conditions at the Lancaster store upon Plaintiff's return from maternity leave***

227.   Plaintiff returned from maternity leave on December 7, 2020. Eck Tr. 98:15-21 (Appendix-000024).

228.   When Plaintiff returned from her maternity leave, the Lancaster store was in shambles. Eck Tr. 322:1-19 (S-APPX000201).

229.   Upon Plaintiff's return from maternity leave, there were 35 to 40 trailers of unprocessed freight in the parking lot of the Lancaster store. Eck Tr. 170:2-8 (S-APPX000168).

230.   Upon Plaintiff's return from maternity leave, the backroom of the Lancaster store was filled with unscanned bins and pallets of unprocessed freight. Eck Tr. 159:19-22; 201:17-202:8 (S-APPX000166; 170-171).

69

231.    Upon Plaintiff's return from maternity leave, there were pallets of merchandise all over the sales floor of the Lancaster store. Eck Tr. 159:19-22; 201:17-202:8 (S-APPX000166; 170-171).

232.    The freight flow issues which arose while Plaintiff was on maternity leave had a domino effect on other store processes. Myers Tr. 33:6-34:15 (S-APPX000279-280).

233.    The freight flow issues which arose while Plaintiff was on maternity leave had a negative impact on the Lancaster store's ability to perform on the OGP metrics. Myers Tr. 35:2-36:16 (S-APPX000281-282).

234.    At the time that Plaintiff returned from maternity leave, most of the other stores in Market 233 were experiencing issues with excess freight which was overflowing into the stores' backrooms and sales floors. Eck Tr. 263:9-21 (S-APPX000187).

235.    When Plaintiff returned from maternity leave, the Lancaster store was extremely short-staffed and was experiencing multiple call-offs every day, in part, due to the Covid-19 pandemic. Eck Tr. 202:21-203:2 (S-APPX000171-172).

236.    After she returned from leave, Plaintiff requested that Mummert send associates from other stores in the Market to assist with processing the excess freight but her requests were denied. Mummert Tr. 219:19-24 (S-APPX000249).

237.    While denying Plaintiff's requests for associates to be sent from other stores in Market 233 to help the Lancaster store work through the backlog of freight, Mummert granted similar requests from store managers in the Market who were not recently pregnant and had not recently taken FMLA leave. Eck Tr. 262:20-22 (S-APPX000186).

***Plaintiff is formally disciplined following her return from maternity leave and amidst several additional job-protected leaves of absence***

238.   Shortly after returning from her maternity leave, Plaintiff and her newborn daughter both contracted Covid, requiring Plaintiff to remain out of work for two (2) weeks. Mummert Tr. 88:1-19 (S-APPX000237).

239.   Additionally, during January 2021, Plaintiff was out of work for a full week due to her daughter's daycare being closed. Mummert Tr. 88:1-19 (S-APPX000237).

240.   Walmart maintains a progressive discipline policy. Disciplinary Action Management Guidelines (S-APPX000078).

241.   Under Walmart's progressive discipline policy, where a performance issue has been identified as needing corrective action but prior to implementing formal disciplinary action, managers are required to have a "documented verbal discussion" with the employee. Disciplinary Action Management Guidelines (S-APPX000078).

242.   During the documented verbal discussion, the employee should be made aware that the discussion is being made pursuant to the company's progressive discipline policy and that it will be documented for record-keeping purposes. Disciplinary Action Management Guidelines (S-APPX000078).

243.   Under Walmart's progressive discipline policy, following the documented verbal discussion, disciplinary action proceeds in three steps: (1) First Written/Yellow Action Plan; (2) Second Written/Orange Action Plan; and (3) Third Written/Red Action Plan. Disciplinary Action Management Guidelines (S-APPX000078).

244.   On March 25, 2021, Mummert administered to Plaintiff a Yellow Coaching. Eck Disciplinary Action History (Appendix-000290).

245.   Mummert did not have a documented verbal discussion with Plaintiff prior to administering the Yellow Coaching. Eck Disciplinary Action History (Appendix-000290).

246.    At the time that Plaintiff received the Yellow Coaching, multiple other stores within Market 233 were experiencing freight flow issues which resulted in excess freight, unscanned bins, and pallets in their backrooms and sales floors but the managers of those stores were not held accountable. Eck Tr. 263:9-21; 325:2-16 (S-APPX000187; 202).

247.    At the time that Plaintiff was issued the Yellow Coaching, Mummert was sending associates and managers to assist in other stores in the Market who were experiencing issues related to freight while simultaneously refusing to offer the same assistance to Plaintiff. Eck Tr. 325:2-16 (S-APPX000202).

248.    At the time that Mummert issued the Yellow Coaching to Plaintiff, the Lancaster store was not the lowest performing store in Market 233 on any of the OGP metrics that store managers' performance is assessed based on. March 15, 2020 OGP Metrics (S-APPX000082); Eck Tr. 325:2-16 (S-APPX000202).

    a.    First-time pick rate: 10 of 12

    b.    On-time pick rate: 9 of 12

    c.    Pre-sub: 10 of 12

    d.    Post-sub: 10 of 12

    e.    Customer satisfaction: 8 of 12

249.    Plaintiff was given a Yellow Coaching because of her pregnancy and because of her maternity leave. Eck Tr. 261:21-23 (S-APPX000185).

250.    As part of the Yellow Coaching, Plaintiff was instructed to provide Mummert with "action plans" to address the issues identified in the corrective action. Eck Disciplinary Action History (Appendix-000290).

251.    After receiving the Yellow Coaching, Plaintiff completed action plans. April 15, 2021 Action Plan (S-APPX000085); May 4, 2021 Action Plan (S-APPX000086).

252.    Mummert acknowledged that the actions plans Plaintiff prepared and submitted after the Yellow Coaching were adequate. Mummert Tr., 127:4-7 (S-APPX000244).

253.    On May 13, 2021, just six (6) weeks after receiving the Yellow Coaching, Mummert issued Plaintiff an Orange Coaching. Eck Disciplinary Action History (Appendix-000279).

254.    At the time that Plaintiff received the Orange Coaching, multiple other stores within Market 233 were experiencing freight flow issues which resulted in excess freight, unscanned bins, and pallets in their backrooms and sales floors but the managers of those stores were not held accountable. Eck Tr. 263:9-21; 325:2-16 (S-APPX000187; 202).

255.    At the time that Mummert issued the Orange Coaching to Plaintiff, there were six (6) stores in Market 233 that were struggling with respect to the OGP metrics but no other store managers were coached or disciplined at that time. May 3, 2021 OGP Metrics (S-APPX000088).

256.    The Orange Coaching falsely stated that Plaintiff "failed to build an effective plan" to deal with the freight issues at the Lancaster store. Eck Disciplinary Action History (Appendix-000279).

257.    Plaintiff was given an Orange Coaching because of her pregnancy and because of her maternity leave. Eck Tr. 261:21-23 (S-APPX000185).

258.    After receiving the Orange Coaching, Plaintiff continued to formulate action plans for the Lancaster store. May 18, 2021 Action Plan (S-APPX000093).

259.    Mummert acknowledged that the May 18th Action Plan was a comprehensive plan on how to deal with the issues identified in Plaintiff's Orange Coaching and that the plan reflected good leadership on Plaintiff's behalf. Mummert Tr., 135:19-136:9 (S-APPX000245-246).

260.    On June 2, 2021, Plaintiff went out on a medical leave as a result of stress and anxiety caused by the discriminatory and retaliatory treatment she was experiencing at Walmart. Termination Request Power Point (Appendix-000282).

261.    Plaintiff returned from her medical leave on June 28, 2021. Termination Request Power Point (Appendix-000282).

***Walmart decides to terminate Plaintiff months after her maternity leave and weeks after an additional medical leave***

262.    On July 24, 2021, less than a month after Plaintiff returned from medical leave, Mummert requested permission from Almeida and Packer to terminate Plaintiff. Termination Request Email (Appendix-000281).

263.    In support of his termination request, Mummert included feedback from several other managers in Market 233 which he solicited *after* deciding he wanted to terminate Plaintiff. Peasley Tr. 123:21-124:6 (S-APPX000255-256).

264.    Almeida and Packer instructed Mummert to administer a Red Coaching to Plaintiff prior to terminating her. Mummert Tr. 206:20-207:10 (S-APPX000246-247).

265.    On July 24, 2021, Mummert issued Plaintiff a Red Coaching. Plaintiff's Disciplinary Action History, (Appendix-000290).

266.    At the time that he issued Plaintiff the Red Coaching, Mummert had already decided to terminate her employment. Mummert Tr. 206:20-207:10 (S-APPX000246-247); Peasley Tr. 123:21-124:6 (S-APPX000255-256).

267. At the time that Plaintiff received the Red Coaching, multiple other stores within Market 233 were experiencing freight flow issues which resulted in excess freight, unscanned bins, and pallets in their backrooms and sales floors but the managers of those stores were not held accountable. Eck Tr. 263:9-21; 325:2-16 (S-APPX000187; 202).

268. At the time that Mummert made the decision to terminate Plaintiff, the Lancaster store was not the lowest performing store in Market 233 on any of the OGP metrics. that store managers' performance is assessed based on. July 23, 2021 OGP Metrics (S-APPX000116).

   a. First-time pick rate: 8 of 12

   b. On-time pick rate: 7 of 12

   c. Pre-sub: 9 of 12

   d. Post-sub: 10 of 12

   e. Customer satisfaction: 100% (better than 5 stores).

269. At the time that Mummert made the decision to terminate Plaintiff, the Lancaster store's performance had been steadily improving on the OGP metrics during the 24 weeks following Plaintiff's return from maternity leave. Termination Request Power Point (Appendix-000282).

270. On August 5, 2021, Plaintiff was terminated. (Appendix-000294).

271. Plaintiff was terminated because of her pregnancy and because of her maternity leave. Eck Tr. 261:3-6 (S-APPX000185).

272. During her termination meeting, Plaintiff requested the opportunity to step down from her Store Manager position and assume a demoted position so that she could continue her eleven (11) year career at Walmart. Eck Tr. 313:24-316:14 (S-APPX000194-197).

75

273.    Other store managers in Almeida's region who had not been recently pregnant and had not recently taken FMLA leave were permitted to assume demoted positions in lieu of termination. Eck Tr. 313:24-316:14 (S-APPX000194-197).

***Walmart's favorable treatment of other Store Managers in Market 233 and bias***

274.    When Plaintiff was terminated, Walmart retained other store managers who were not recently pregnant and had not recently taken FMLA leave whose stores were performing worse on the OGP metrics than the Lancaster store. PSF ¶¶ 215, 248, 255, 268.

275.    When Plaintiff was terminated, Walmart retained other store managers who were not recently pregnant and had not recently taken FMLA leave whose stores were struggling with excess freight and issues stemming from same. Beistline Tr. 74:10-76:15 (S-APPX000304-306); Myers Tr. 33:6-34:15 (S-APPX000279-280).

276.    Throughout 2021, Steve Myers, another Store Manager in Market 233, was experiencing identical freight and staffing issues at those Plaintiff was experiencing in the Lancaster store. Beistline Tr. 74:10-76:15 (S-APPX000304-306); Myers Tr. 33:6-34:15 (S-APPX000279).

277.    The freight issues at Steve Myers' store were so significant that excess freight and pallets were being stored on the second floor of his store which is where the Market 233's offices are located, including Mummert's office. Myers Tr. 41:16-43:1 (S-APPX000284-288).

278.    Throughout 2021, Steve Myers' store was performing worse than Plaintiff on OGP metrics. PSF ¶¶ 215, 248, 255, 268.

279.    Throughout 2021, Mummert sent assistance to Steve Myers' store to assist with processing of the excess freight, sometimes for several weeks at a time. Myers Tr. 38:19-40:10 (S-APPX000283-284).

280.    Consistent with Walmart's progressive discipline policy, Steve Myers received a documented verbal discussion regarding store standards prior to being given a Yellow Coaching. Myers Tr. 19:4-22:20 (S-APPX000275-278).

281.    Consistent with Walmart's progressive discipline policy, Myers was given 30 days to improve upon the issues raised during the documented verbal discussion prior to receiving a Yellow Coaching. Myers Tr. 19:4-22:20 (S-APPX000275-278).

282.    Mummert put Myers on a Yellow Coaching in January 2021 for identical issues as those addressed in Plaintiff's Yellow, Orange, and Red Coachings. Steven Myers Disciplinary Action History (Appendix-000344).

283.    Myers was given more than ten (10) months to improve upon the issues covered by his Yellow Coaching before being placed on an Orange Coaching. Steven Myers Disciplinary Action History (Appendix-000344).

284.    Myers was placed on an Orange Coaching for store standards in September 2021. Steven Myers Disciplinary Action History (Appendix-000344).

285.    Myers was never given a Red Coaching or terminated. Steven Myers Disciplinary Action History (Appendix-000344).

286.    Given the fact that his store was experiencing identical issues with freight, bin scanning, and zoning in 2021, Myers testified that it was surprising that Plaintiff received Yellow, Orange, and Red Coachings within a span of less than four (4) months. Myers Tr. 50:12-51:18 (S-APPX000289-290).

287.    Plaintiff was replaced by a male employee. Eck Tr. 321:4-11 (S-APPX000200).

288.    Beistline, the Co-Manager who was in charge of the Lancaster store at the time when the freight flow and related issues which ultimately formed the basis of Plaintiff's

termination arose, was never formally coached or disciplined for allowing the conditions at the Lancaster store to deteriorate. Beistline Tr. 45:11-16 (S-APPX000298).

289.    Following Plaintiff's termination, Beistline was promoted to Store Manager at Walmart's Harrisburg store. Beistline Tr. 35:21-24 (S-APPX000297).

290.    Because so many stores in Market 233 were experiencing freight issues in 2021 which inhibited the stores' ability to perform on the OGP metrics, Walmart adjusted its bonus guidelines to enable store managers in Market 233 to receive bonuses despite being technically ineligible. Myers Tr. 54:13-57:15 (S-APPX000291-294).

291.    Walmart adjusted its bonus guidelines because it understood that the freight flow issues which caused store managers in Market 233 to be unable to meet the OGP metrics were out of the store managers' control. Myers Tr. 57:3-15 (S-APPX000294).

292.    From August 1, 2018 through August 1, 2021, five (5) store managers supervised by Mummert took FMLA, maternity leave, or a leave of absence. Walmart's Supplemental Interrogatory Responses (S-APPX000108). Four (4) of these five (5) store managers were terminated by Walmart following their return from leave. *Id.*

<div style="margin-left:40%">

**CONSOLE MATTIACCI LAW, LLC**

By:    */s/ Holly W. Smith*
       Holly W. Smith, Esquire
       Rahul Munshi, Esquire
       1525 Locust St., 9th Floor
       Philadelphia, PA 19102
       Phone: (215) 545-7676
       hollysmith@consolelaw.com
       munshi@consolelaw.com

</div>

Dated: 7/1/2024                          *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 1st day of July 2024, the foregoing Plaintiff's Brief In Opposition To Defendants' Motion For Summary Judgment was electronically filed, via ECF, and is available for viewing and downloading to all counsel of record:

<div align="center">

Michael J. Kincade, Jr., Esquire
Andrew T. Simmons, Esquire
BUCHANAN INGERSOLL & ROONEY PC
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102
(215) 665-8700

*Counsel for Defendants,*
*Walmart Inc. and Walmart Associate, Inc.*

</div>

**CONSOLE MATTIACCI LAW, LLC**

By:    */s/ Rahul Munshi*
Rahul Munshi, Esquire
munshi@consolelaw.com
Holly W. Smith, Esquire
hollysmith@consolelaw.com
1525 Locust Street, 9th Floor
Philadelphia, PA 19102
(215) 545-7676

*Counsel for Plaintiff, Karle Eck*